SICKLESMITH, Appellee,

v.

CHESTER HOIST et al., Appellants.

[Cite as *Sicklesmith v. Chester Hoist*, 169 Ohio App.3d 470, 2006-Ohio-6137.]

Court of Appeals of Ohio,
Seventh District, Columbiana County.

No. 05–CO–20.

Decided Nov. 15, 2006.

472

474

Andrew L. Margolius, for appellee.

Roetzel & Andress, L.P.A., James D. Kurek, and Karen D. Adinolfi, for appellants.

---

DONOFRIO, Judge.

{¶ 1} Defendants-appellants, Chester Hoist and J. Robert Burkey, appeal from a Columbiana County Common Pleas Court judgment in favor of plaintiff-appellee, Clarence Sicklesmith, on appellee's claim for disability discrimination. The judgment followed a jury trial.

{¶ 2} Chester Hoist is a hoist manufacturer and a division of Columbus McKinnon Corporation. Burkey is Chester Hoist's general manager.

{¶ 3} Appellee began his employment with Chester Hoist's predecessor in 1979. He worked first as a laborer and then as an inspector. His job as an inspector required him to be on his feet at least seven hours out of an eight-hour day on the concrete plant floor. He inspected and measured all of the parts in the plant to ensure that they were made properly. The job also included some heavy lifting and some paperwork.

{¶ 4} In June 1996, while appellee was at work, a forklift ran over appellee's foot and crushed it. He never returned to work at Chester Hoist again.

{¶ 5} Appellee began receiving workers' compensation for his temporary total disability and remained as an employee on leave until April 8, 2002, when appellants terminated his employment. During this time, appellee suffered several complications resulting from his original injury and underwent several surgeries, physical therapy, and a work-hardening program.

{¶ 6} In the early part of 2001, Burkey offered appellee a different position at Chester Hoist that was not as physically demanding. However, appellee did not accept this position because his physician had not yet cleared him to return to work.

{¶ 7} In November 2001, appellee contacted Burkey and told him he was ready to come back to work as an inspector. He told Burkey that he could perform the job if he was permitted the accommodation of resting his foot occasionally and taking the time to loosen his boot and readjust his foot.

{¶ 8} Chester Hoist asked appellee to submit medical evidence that he was fit to return to his former position. Appellee submitted a report from his physician and various other reports, which he believed supported his statement that he was ready to return to the inspector position as long as Chester Hoist allowed him his requested accommodation. Chester Hoist interpreted these reports differently, considered appellee's past medical records, and determined that appellee could not return to work. It subsequently terminated appellee's employment.

{¶ 9} Appellee filed a complaint against appellants on October 1, 2002, asserting causes of action for disability discrimination, retaliatory discharge, and discharge in violation of public policy. Appellants filed a motion for summary judgment on all claims. The trial court granted the motion on all claims except for the disability-discrimination claim.

{¶ 10} The case proceeded to a jury trial on the disability-discrimination claim. The jury returned a verdict in favor of appellee. It awarded him $172,500 in compensatory damages, back pay, and front pay and also awarded him $100,000 in punitive damages. Appellants filed a timely notice of appeal on April 20, 2005.

{¶ 11} Appellants raise seven assignments of error. They will be addressed out of order for ease of discussion.

{¶ 12} Appellants' second assignment of error states:

{¶ 13} "The trial court abused its discretion to the prejudice of defendants-appellants when it refused, after request by defendants-appellants, to instruct the jury on the attorney-client privilege."

{¶ 14} Here appellants argue that while appellee's counsel questioned Burkey at trial, counsel persistently made references to communications protected by the attorney-client privilege. Appellants objected and asserted the attorney-client privilege. Appellants asked the court to give the jurors an instruction about the attorney-client privilege and to instruct them that they were to draw no adverse inferences from the invocation of the privilege. The court refused. Appellants argue that this was error because it left the jury with the feeling that appellants were hiding something because they invoked the privilege.

{¶ 15} The decision to give a jury instruction is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. McCleod* (Dec. 12, 2001), 7th Dist. No. 00–JE–8, 2001 WL 1647305. Abuse of discretion connotes more than an error of law or judgment; it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

{¶ 16} In this case, while cross-examining Burkey, appellee's counsel asked Burkey whether he had discussed appellee's accommodation request with Bob Myers, Columbus McKinnon's vice president of human resources. Burkey's reply was that he discussed it with the company's attorneys. Counsel interrupted Burkey at this point, stating, "Now wait a second. You know, we can't get into there. The doors close when you talk about your attorneys, because it's all privileged. It's this big vacuum—." At this point, appellants' counsel objected and asked the court for a jury instruction. The court then instructed the jury: "Attorney/Client privilege prohibits, unless it is waived by the party, discussion of what they talked about with the lawyers. And that's why—that's what the argument here is."

{¶ 17} Appellee's counsel then continued questioning Burkey as follows:

{¶ 18} "Q. * * * The discussions that you had with your attorney are attorney/client privilege; right?

{¶ 19} "A. Yes.

{¶ 20} "Q. So, you refuse to tell us what your attorneys told you and recommended to you because of this privilege; right?"

{¶ 21} Appellants then objected and the court sustained the objection.

{¶ 22} While the court did not give another instruction regarding attorney/client privilege, in its jury instructions it did charge the jury as follows:

{¶ 23} "During the course of the trial there were some objections, there were some requests that I strike certain questions and statements, to which I sustained objections to; you must treat those things as if you did not hear them. They are not evidence.

{¶ 24} "Do not speculate on what the answer to any question would have been that I did not permit to be answered. Do not accept as the truth the suggestion made in any question that I did not permit to be answered.

{¶ 25} "Keep in mind that the questions are not evidence, only the answers are evidence."

{¶ 26} The court immediately instructed the jury about attorney/client privilege upon appellants' first objection. Additionally, although the court did not give another instruction specific to attorney/client privilege in its final jury charge, it did give the above-quoted instruction that was directly applicable to the objectionable question asked by appellee's counsel. Thus, the court did not abuse its discretion by refusing to give another attorney/client privilege instruction. Furthermore, this case involved a substantial amount of testimony and evidence. The attorney/client privilege issue barely took up two pages of the transcript. It is unlikely that it played a significant part in the jury's decision. Accordingly, appellants' second assignment of error is without merit.

{¶ 27} Appellants' third assignment of error states:

{¶ 28} "The trial court abused its discretion to the prejudice of defendants-appellants when it excluded evidence and testimony about the arbitration decision which found that plaintiff-appellee had been discharged for just cause."

{¶ 29} After appellee was terminated, his union filed a grievance that proceeded to arbitration. The arbitrator found that appellants had just cause to fire appellee and that no violation of the collective bargaining agreement ("CBA") occurred. Appellee filed a motion in limine prior to trial seeking to exclude the arbitration decision from evidence. At trial, the court permitted appellants to identify the arbitration decision but then excluded it.

{¶ 30} Appellants argue that the trial court abused its discretion in disallowing the arbitration decision into evidence. They claim that the arbitration decision was vital to their claim of acting in good faith by showing that they abided by the CBA. They argue that the arbitration decision rebuts any claim of bad faith and would have resulted in the jury's reaching a different conclusion on the issue of punitive damages.

{¶ 31} The decision to admit or exclude evidence rests in the trial court's sound discretion, and we will not reverse its decision absent an abuse of that discretion. *Wightman v. Consolidated Rail Corp.* (1999), 86 Ohio St.3d 431, 437, 715 N.E.2d 546.

{¶ 32} On cross examination, appellants' counsel questioned appellee about the grievance he filed pursuant to the CBA. Appellee testified that the grievance went to arbitration and that the arbitrator reached a decision. However, the court sustained appellee's objection as to whether the arbitrator denied the grievance. The court instructed the jury that it was not to consider evidence of the arbitration as evidence of whether appellee was able to work.

{¶ 33} Appellants' argument as to why the court should have admitted the arbitration decision is twofold. First, they claim that the arbitration decision showed that they acted in good faith by abiding by the CBA. But appellants still had this benefit without submitting the actual decision to the jury. The jury still learned that appellee filed a grievance, appellants filed a response to the grievance, and the parties participated in the arbitration process. This evidence had the same effect of showing that appellants acted in good faith in accordance with the process set out in the CBA. The actual arbitration decision was unnecessary to show that appellants abided by the CBA process. No matter what the final arbitration decision, appellee's testimony served the purpose of showing that appellants complied with the process.

{¶ 34} Second, appellants contend that the arbitration decision would have rebutted appellee's claim of bad faith, therefore eliminating the jury's award of punitive damages. However, as we will discuss below in appellants' first assignment of error, the jury had sufficient evidence from which to conclude that punitive damages were warranted. Furthermore, as appellee points out, the arbitration decision could have confused the jury as to what the issue was in this case. The issue was not whether appellants followed the CBA and had just cause to terminate appellee, as would have been the case at the arbitrator's hearing. Instead, the issue was whether appellants acted in good faith in considering his accommodation request based on disability-discrimination law. Thus, the trial court did not abuse its discretion in deciding to exclude the arbitration decision from evidence.

{¶ 35} Accordingly, appellants' third assignment of error is without merit.

{¶ 36} Appellants' fourth assignment of error states:

{¶ 37} "The trial court erred as a matter of law when it instructed the jury that it was defendants-appellants' burden to demonstrate that the accommodation plaintiff-appellee requested was unreasonable."

{¶ 38} Here appellants assert that the trial court gave the jury improper instructions regarding the burden to demonstrate a reasonable accommodation. They claim that the court's instruction placed the burden on them to prove that appellee's requested accommodation was unreasonable instead of placing the burden on appellee to prove that his requested accommodation was reasonable. Appellants refer us to the following portion of the court's jury instructions, to which they objected:

{¶ 39} "Now let me discuss—we've heard a lot about reasonable accommodation. An employer must make reasonable accommodations to an employee's disability.

{¶ 40} "The Plaintiff claims that with reasonable accommodation he could have performed the essential functions of the job of inspector. The Defendants deny this, they claim that there was no reasonable accommodation that can be made to allow the Plaintiff to perform this job.

{¶ 41} "To establish that he was denied reasonable accommodation the Plaintiff must show by a preponderance of the evidence all of the following:

{¶ 42} "1.) That he is disabled, or regarded as being disabled.

{¶ 43} "2.) That he is qualified for the position of inspector, because of his skill, experience, education and other job-related requirements for that position.

{¶ 44} "3.) That he can perform the essential functions of the position of inspector with reasonable accommodation.

{¶ 45} "4.) That he requested the Defendants accommodate his disability, and

{¶ 46} "5.) That the Defendants failed to reasonably accommodate his disability.

{¶ 47} " * * *

{¶ 48} "*Now the Defendants, as I said, claim there was no accommodation it could make that would enable the Plaintiff to perform the essential functions of this job. This is an affirmative defense, and on this defense the Defendants bear the burden of proving to you the defense by a preponderance of the evidence.*

{¶ 49} "In determining whether an accommodation would be reasonable or unreasonable you will consider all of the following factors:

{¶ 50} "1.) The nature and net cost of any accommodation needed, taking into consideration the availability of any tax credits or deductions;

{¶ 51} "2.) The financial resources of the Defendants' facility or facilities involved;

{¶ 52} "3.) The number of persons at that facility;

{¶ 53} "4.) The effect on the Defendants' expenses and resources;

{¶ 54} "5.) The financial resources of the Defendant as a whole;

{¶ 55} "6.) The overall size of the business with respect to its total number of employees;

{¶ 56} "7.) The number and type of its facilities, and location. The type of operation or operations of the employer, including the composition, structure, and functions of the work force;

{¶ 57} "8.) The geographic separateness and administrative or fiscal relationship of the facility to the employer;

{¶ 58} "9.) The impact of the accommodation upon the operation of the facility involved, including the impact on the ability of other employees to perform their duties, the impact on the facility's ability to conduct business.

{¶ 59} "Let me reiterate, it is the Plaintiff's burden to prove to you that the accommodation he requested would be effective; that is the accommodation would enable him to do his job.

{¶ 60} "If you find that the Plaintiff met this burden, then the Defendants may still prevail *if they prove to you by a preponderance of the evidence that the accommodation which the Plaintiff proposed would be unreasonable.*" (Emphasis supplied by appellants.)

{¶ 61} Appellants claim that this instruction removed the burden from appellee to prove that his requested instruction was reasonable. They further claim that it shifted the burden to them to prove that the accommodation was unreasonable. Appellants argue that had they raised the affirmative defense of undue burden, then it would have been proper to shift the burden to them to prove it. However, since reasonable accommodation is an element of appellee's claim, they assert the court erred by requiring them to prove that the requested accommodation was unreasonable.

{¶ 62} As stated above, whether to give a jury instruction is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *McCleod,* 7th Dist. No. 00–JE–8, 2001 WL 1647305. On review, we will not consider a single jury instruction in isolation. *State v. Jalowiec* (2001), 91 Ohio St.3d 220, 231, 744 N.E.2d 163. Instead, we consider jury instructions in their entirety. *Sech v. Rogers* (1983), 6 Ohio St.3d 462, 464, 6 OBR 515, 453 N.E.2d 705. Ordinarily, reversible error does not consist of misstatements or ambiguity in a part of the instruction. Id.

{¶ 63} In this case, we must also consider the following instructions in addition to those cited above by appellants. Before giving the jury the above-cited instruction, the court also instructed:

{¶ 64} "First of all, let me redefine the burden of proof for you. The burden proof [sic] rests on the Plaintiff to prove those facts necessary for his claims, by what we call a preponderance of the evidence. The Defendants also have raised an affirmative defense, and bears the burden by the same weight, by the same preponderance of the evidence on that defense.

{¶ 65} " * * *

{¶ 66} "In order to establish a claim of disability discrimination, a plaintiff must show, by a preponderance of the evidence that he is disabled; that an adverse employment action was taken by an employer, at least in part, because of that disability; and that he can safely and substantially perform the essential functions of the job in question.

{¶ 67} "If the Plaintiff establishes a prima facie case of discrimination then the burden shifts to the Defendants to set forth some legitimate, non-discriminatory reason for their action taken,

{¶ 68} "Now a legitimate and non-discriminatory reason for such action may include, but is not limited to the inability of the Plaintiff to safely and substantially perform, with reasonable accommodations, the essential functions of the job sought.

{¶ 69} "If the employer establishes these legitimate non-discriminatory functions, then the employee, that is the Plaintiff in this case, must demonstrate that the employer's stated positions is [sic] merely a pretext for discrimination.

{¶ 70} "Before you may find for the Plaintiff you must find by the greater weight of the evidence that he is disabled, or is regarded as having a physical— that he is disabled in that he has, or is regarded as having, excuse me, a physical impairment that substantially limits one or more of life's major activities, which I will define for you.

{¶ 71} "And B: He was qualified for the position of inspector because he satisfies the skill, experience, education and other job-related qualifications for that position; and

{¶ 72} "C: He can perform the essential functions of the position of inspector, with reasonable accommodations, and

{¶ 73} "D: His disability was a determining factor in the Defendants' decision to discharge him."

{¶ 74} In order to prove a case of disability discrimination, the plaintiff must prove that (1) he or she is disabled; (2) action was taken by the employer (at least in part) because the plaintiff was disabled; and (3) even though the plaintiff is disabled, he or she can safely and substantially perform the essential functions of the job in question with reasonable accommodations. *Wooten v.*

*Columbus, Div. of Water* (1993), 91 Ohio App.3d 326, 332, 632 N.E.2d 605. Accommodations for disabled workers are unreasonable only if they place an undue hardship on the employer. *Berge v. Columbus Community Cable Access* (1999), 136 Ohio App.3d 281, 325, 736 N.E.2d 517. The employer carries the burden of showing undue hardship. Id.

{¶ 75} The court's instructions, read as a whole, provided the jury with the proper law regarding burdens of proof. The court made clear that the burden of proof was on appellee to prove that he could perform his job with a reasonable accommodation. It then instructed the jury that if appellee met his burden, the burden then shifted to appellants to show that there was no accommodation they could make that would enable appellee to be able to perform his job. The court even reiterated that it was appellee's burden to prove that the accommodation he requested would be effective and would enable him to do his job.

{¶ 76} The jury interrogatories also provided the jurors with the proper burden-shifting analysis.

{¶ 77} The third interrogatory asked: "Do you find that plaintiff has proven by the preponderance of the evidence that he requested a reasonable accommodation?"

{¶ 78} The third interrogatory then instructed the jury that if it answered "no" to this question, then it must skip the next two interrogatories and return a verdict for the defendants. Thus, if the jury found that appellee had not proved by a preponderance of the evidence that the accommodation he requested was reasonable, then it was to enter a defense verdict. This put the burden of proof on appellee to demonstrate that the requested accommodation was reasonable. Therefore, even if the court's instructions to the jury were somehow confusing as to the burdens of proof, the interrogatories would have cleared up any confusion and ensured that the jury applied the proper burdens.

{¶ 79} For these reasons, the trial court did not abuse its discretion in charging the jury as it did. Accordingly, appellants' fourth assignment of error is without merit.

{¶ 80} Appellants' fifth assignment of error states:

{¶ 81} "The trial court erred as a matter of law when it allowed the issues of back pay and front pay to go to the jury when there was inadequate proof of the wage loss suffered."

{¶ 82} The jury returned an award of front pay in the amount of $80,000 and back pay in the same amount for appellee.

{¶ 83} Appellants claim here that the court erred in sending the issues of back pay and front pay to the jury because appellee had failed to present adequate

evidence of how much he earned while working at Chester Hoist. They assert that the only evidence presented was that of appellee's replacement, Terry Fulk, who merely testified that he earned $41,000 in 2004. Appellants argue that the jury should have determined what appellee actually earned at the time of his injury and then adjusted that figure for inflation, overtime, and other variables, none of which appellee presented evidence to support.

{¶ 84} Front pay is an equitable remedy designed to financially compensate an employee when reinstatement of the employee would be impractical or inadequate. *Worrell v. Multipress, Inc.* (1989), 45 Ohio St.3d 241, 246, 543 N.E.2d 1277. It is up to the trial court's sound discretion to determine whether front pay is appropriate under the circumstances of the case. Id. If the court determines that front pay is an appropriate remedy, then the jury determines the amount of damages. Id.

{¶ 85} The purpose of back pay is to make wrongfully terminated employees whole and to put them in the position they would have been in had their employment not been terminated. *State ex rel. Stacy v. Batavia Local School Dist. Bd. of Edn.*, 105 Ohio St.3d 476, 2005-Ohio-2974, 829 N.E.2d 298, at ¶ 26.

{¶ 86} The evidence regarding appellee's wages was as follows.

{¶ 87} As to front pay, Terry Fulk's testimony was relevant. Fulk replaced appellee as the inspector at Chester Hoist and has been performing that job for eight years. He testified that his hourly rate is $15.36. He further stated that he works overtime every day. And Fulk stated that his income from Chester Hoist in 2004 was $41,000. Since the inspector position is a unionized position, presumably appellee's wages would have been the same as or similar to Fulk's wages. Furthermore, Fulk was a less-senior employee than appellee. Fulk testified that he had been at Chester Hoist for 15 years. At the time of his injury, appellee had been at Chester Hoist for 17 years.

{¶ 88} As to back pay, a copy of appellee's application for workers' compensation was introduced by appellants and admitted into evidence. It is signed by both appellee and Chester Hoist's general manager. It lists appellee's hourly rate at the time of his injury at $12.37. It also states that appellee was scheduled to work 45 hours the week of his injury. It then lists appellee's weekly wages for the entire year before his injury, along with the number of days he worked each week.

{¶ 89} From appellee's workers' compensation application, the jury knew how much appellee was earning at the time of his injury. From Fulk's testimony, jurors learned what appellee would have been earning eight years later had he remained in the inspector position. This evidence was sufficient for the court to

submit the issues of front pay and back pay to the jury. With the evidence listed above, the jury could have been able to estimate what appellee's damages were regarding front pay and back pay. Accordingly, appellants' fifth assignment of error is without merit.

{¶ 90} Appellants' sixth assignment of error states:

{¶ 91} "The verdicts are against the manifest weight of the evidence."

{¶ 92} Here appellants point to the following evidence to support their claim that the jury's verdict was against the weight of the evidence: (1) until November 2001, appellee consistently declined to return to work, stating that his physical condition would not allow him; (2) the medical evidence demonstrated that appellee was unable to return to his former position; therefore, when appellee requested to return to work, appellants requested medical documentation showing that he could safely perform his job; (3) appellee agreed that this request was reasonable; (4) appellee never submitted any documentation indicating that his condition had improved to the point that he could return to his job but instead submitted documentation that showed he was deficient in the physical requirements needed to perform the essential functions of his job; and (5) as of March 2004, appellee's physician indicated that appellee could not return to his former position.

{¶ 93} A judgment supported by some competent, credible evidence going to all the material elements of the case must not be reversed as being against the manifest weight of the evidence. *Willett v. Felger* (Mar. 29, 1999), 7th Dist. No. 96–CO–40, 1999 WL 182510; *Gerijo, Inc. v. Fairfield* (1994), 70 Ohio St.3d 223, 226, 638 N.E.2d 533. Furthermore, in considering whether a judgment is against the manifest weight of the evidence, it is important that this court be guided by the presumption that the findings of the trier of fact are correct. *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273. If the evidence is susceptible of more than one interpretation, we must construe the evidence consistently with the trial court's judgment. *Gerijo,* 70 Ohio St.3d at 226, 638 N.E.2d 533.

{¶ 94} R.C. 4112.02(A) provides that it is an unlawful discriminatory practice for "any employer, because of the * * * disability, * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

{¶ 95} The term "employer" includes "any person employing four or more persons within the state, and *any person acting directly or indirectly in the interest of an employer.*" (Emphasis added.) R.C. 4112.01(A)(2). Thus, R.C. 4112.01(A)(2)'s definition of "employer" encompasses individual supervisors and

managers whose conduct violates the provisions of R.C. Chapter 4112. *Genaro v. Cent. Transport, Inc.* (1999), 84 Ohio St.3d 293, 296, 703 N.E.2d 782. The Ohio Supreme Court has held, "For purposes of R.C. Chapter 4112, a supervisor/manager may be held jointly and/or severally liable with her/his employer for discriminatory conduct of the supervisor/manager in violation of R.C. Chapter 4112." Id. at syllabus.

{¶ 96} Therefore, we must examine whether the weight of the evidence demonstrated that both Chester Hoist and Burkey, as appellee's supervisor, terminated appellee based on his disability without just cause.

{¶ 97} As stated earlier, to prove a case of disability discrimination, the plaintiff must establish that (1) he or she is disabled; (2) action was taken by the employer (at least in part) because the plaintiff was disabled; and (3) even though the plaintiff is disabled, he or she can safely and substantially perform the essential functions of the job in question with reasonable accommodations. *Wooten*, 91 Ohio App.3d at 332, 632 N.E.2d 605. If the plaintiff establishes a prima facie case of disability discrimination, the burden shifts to the employer to set forth some legitimate, nondiscriminatory reason for the action taken. *Hood v. Diamond Prods., Inc.* (1996), 74 Ohio St.3d 298, 302, 658 N.E.2d 738. Finally, if the employer establishes a nondiscriminatory reason for the action taken, then the employee must demonstrate that the employer's stated reason was a pretext for impermissible discrimination. Id.

{¶ 98} First, appellee had to demonstrate that he is disabled. R.C. 4112.01(A)(13) defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment." Physical impairment includes orthopedic conditions. R.C. 4112.01(A)(16)(a)(ii).

{¶ 99} The evidence supports a finding that appellee is disabled. Appellee clearly demonstrated that he suffers from an orthopedic condition. He testified that he injured his right foot at work in 1996 and still wears a brace on that foot. Furthermore, several doctors and therapists testified regarding appellee's condition, the treatment he has received, and the physical therapy he has undergone. Appellee testified that the injury to his foot affects his day-to-day life activity of walking. Crystal Sicklesmith, appellee's wife, also testified that appellee is substantially limited in the activity of walking. Additionally, Burkey testified that appellee had a "walking disability" and was disabled when it came to being able to return to his job.

{¶ 100} Second, appellee had to prove that appellants terminated his employment because he is disabled. Again, there does not seem to be much dispute here. Burkey stated that appellee could not perform the inspector's job because he lacked the mobility to move around the plant and was unable to meet the lifting requirements of the job.

{¶ 101} The crux of this case centered on the third element appellee had to prove. Appellee had to show that even though he is disabled, he can safely and substantially perform the essential functions of the inspector's job with a reasonable accommodation. Most of the testimony focused on this issue. This element can be broken down into several categories.

## ESSENTIAL FUNCTIONS

{¶ 102} Burkey testified that no written job description exists for the inspector position. He admitted that the main function of the inspector's job is inspection. He stated that inspection includes measuring parts, visually inspecting parts, and performing various tests. However, Burkey then testified that measuring and inspecting takes up only about five to ten percent of the inspector's time. He also stated that paperwork takes up five to ten percent of the job. Burkey stated that the majority of the inspector's time is spent moving from location to location throughout the plant and getting the parts into a position to be inspected. However, Burkey admitted that the inspector is not constantly moving throughout the day, but stops to inspect things and frequently stands.

{¶ 103} Terry Fulk, appellee's replacement as the inspector, also testified about the essential job functions. According to Fulk, the most important function of his job is inspecting and measuring parts. He compares parts to their blueprints to make sure that the parts match the blueprint. Fulk conducts some of the inspections out in the workplace and some he does at his desk.

{¶ 104} Fulk also testified as to the rest of his job functions. He sometimes calibrates machines. He does paperwork, which takes approximately 25 percent of his time. This paperwork is spread out over the course of a day. When Fulk does paperwork, he is sitting.

{¶ 105} As to lifting, Fulk testified that if he needs help lifting something, there is always somebody around to help. Additionally, some of the heavier parts he lifts with a hoist. Fulk even uses the hoists for some of the medium-heavy parts in order to avoid hurting himself. Furthermore, after he began at the inspector job, a hoist was added into Fulk's area to lift large gears and has made his job easier.

{¶ 106} Mark Anderson, a vocational expert, also testified regarding the essential function of the inspector job. He opined that the essential function is to

inspect finished and incoming products against predetermined standards. The inspection function, Anderson testified, is based on experience and knowledge of how to use the various measuring devices, along with hand and eye inspection. Anderson testified that the "exertional requirements" are different from the "essential functions." Exertional requirements, he stated, include the requirements to stand, sit, walk, or lift. Anderson stated, "[T]he essential function, bottom line, is what you get paid to do. You get paid to inspect parts. What is required, exertionally, are the things that we're usually looking at to make accommodations, of the things that can be accommodated."

{¶ 107} When asked how he would categorize the inspector's job, Burkey stated that it is a "very heavy job." He based his opinion on the fact that the inspector is required to spend eight hours a day on his feet, on a concrete floor, lifting heavy items from the floor to his chest in order to take measurements. When further pressed on the question of what constitutes a "heavy" job, Burkey stated that a security officer who spends all day on his feet would also have a heavy job.

{¶ 108} Anderson, however, testified that job-demand levels are based on how much lifting is required. He stated that the amount of walking involved is not the determining factor in how a job is categorized.

{¶ 109} Appellee also testified about an inspector's essential job functions. He stated that his main function was to inspect parts that came off the machines by calibrating, measuring, and comparing the parts to the blueprints. He also did paperwork and calibrated equipment. And he checked incoming parts from other companies. Appellee stated that he spent anywhere from 15 to 25 percent of his time doing paperwork.

{¶ 110} Appellee stated that periodically throughout the day, he was on his feet a lot. But he also stated that being on his feet was not constant. He pointed out that he could check a part while leaning against a table or sitting. Appellee stated that he had a chair and a desk at his work station. Additionally, appellee could lean against toolboxes and benches when he inspected parts at different workstations.

{¶ 111} As to lifting, appellee stated that Chester Hoist had a rule that no one was to lift anything over 40 pounds on his own. He stated that someone was always around to help move heavy parts, and hoists were available to lift heavy parts.

## ACCOMMODATION REQUEST

{¶ 112} On November 1, 2001, appellee indicated to Burkey that he wanted to come back to work and believed he could do his job. Burkey testified that he did

not think appellee was capable of doing the job. Appellee indicated to Burkey that he could do the job as long as he could take a little bit of time to take the weight off of his foot or to loosen his boot. Burkey admitted that he considered this to be an accommodation request. Burkey also admitted that appellee repeatedly told him that he could do his job with a little help.

{¶ 113} Burkey stated that he explored several accommodations for appellee, but none would have worked. Counsel asked Burkey whether the inspector could carry a stool on his cart so that he could lean or sit when needed. Burkey responded, "No." He stated that there was no room for a cart. This was despite the fact that two-ton forklifts move up and down the aisles at the plant. And he stated that appellee could not use a stool because he cannot sit down when he does his inspections and has too many locations in the plant to do inspections, so he would have to carry the stool around with him or have stools all over the plant.

{¶ 114} Burkey stated outright that no accommodation would have allowed appellee to do the inspector's job. He further stated that he only looked to provide appellee with a sedentary job. Burkey admitted that he reached the conclusion that appellee could perform only a sedentary job from a January 11, 2002 functional capacity evaluation ("FCE"). He further stated that appellee's accommodation was not reasonable or practical based on the medical evidence that appellants had. When asked why Burkey did not mention that appellee's accommodation request was unreasonable in the discharge letter to appellee, the following exchange took place:

{¶ 115} "A. That's because by this point Clarence had already threatened to sue the company, so, the lawyers were attempting not to put anything in this letter that could be used against us later.

{¶ 116} "Q. Like the real reason for firing him?

{¶ 117} "A. Yes."

{¶ 118} Furthermore, Burkey stated that appellants based their decision to terminate appellee on the fact that the FCE stated that appellee could be on his feet for only one hour out of an eight-hour day. Importantly though, Burkey admitted that the evaluation did not take into account what appellee could do with a reasonable accommodation.

{¶ 119} Fulk testified that he has a cart on wheels that he takes to check certain things like incoming parts. The cart is approximately four-and-a-half feet long by two to three feet wide. Fulk stated that his cart does not interfere with the productivity of the workplace. He stated that he sometimes does inspections right on his cart. Importantly, Fulk stated that he can lean or sit on his cart if he needs to. Also, Fulk stated that there was room on his cart for a small stool.

{¶ 120} Burkey admitted that Fulk has a cart that measures approximately two feet by three feet on which he stores his measuring devices and test equipment. He stated that Fulk leaves his cart in the aisle when he inspects certain machines because the cart will not fit in all of the spaces he needs to go.

{¶ 121} Additionally, Fulk testified that at the work stations where he does inspections, the person operating the machine has a bench. Fulk stated that he can lean against the bench if he needs to take the weight off of his foot while doing an inspection, and leaning does not interfere with the inspection.

{¶ 122} Significantly, Fulk testified that although he spends most of his day on his feet, he does not have to in order to do his job. Fulk stated that there are things he could bring back to his desk to do, he could lean throughout the day, and he could even occasionally use a stool—all without interfering with his inspections.

{¶ 123} Additionally, Anderson, the vocational expert, testified that accommodations such as being able to lean against something or rest one's foot would not have interfered with the essential functions of the inspector job.

{¶ 124} Appellee testified that he felt he could do the inspector job with an accommodation. He asked that he be able to take the weight off of his foot for a few minutes at a time. He also asked that he be permitted to loosen his boot and adjust his brace when his foot hurt. Appellee asked Burkey for this accommodation several times. Burkey told appellee to have his doctor document this request and to get into a rehabilitation program. Appellee did these things. Appellee stated that Burkey never told him why his requested accommodation would not work, nor did Burkey suggest any alternative accommodations. Burkey's only response to appellee was, "No, you're not coming in the shop."

{¶ 125} At some later time, possibly after appellants terminated him, appellee asked to come back for a 30–day trial period. At the time, he was still collecting workers' compensation. The Bureau of Workers' Compensation even offered to pay appellee during the 30–day period so Chester Hoist would not have to pay him. Appellee explained this to Burkey. However, Burkey refused this request. Burkey stated that appellee had made this request after appellants terminated him. Burkey testified that bringing appellee back to work for 30 days would not have changed the fact that his capabilities were too far below the job requirements.

{¶ 126} Additionally, Myers, the human resources vice president, testified that when an employee's doctor says that the employee would benefit from being able to shift between standing and sitting throughout the day and can do medium-level work, he would assume it was an accommodation request.

492

## MEDICAL INFORMATION

{¶ 127} Dr. Michael Stanton Hicks, who specializes in pain management and has been treating appellee since 1997, also testified about appellee's condition. He stated that in early 2002, appellee believed, and he agreed, that appellee could return to work as long as he could change positions and not be constantly on his feet. Dr. Hicks stated that in his opinion, prior to 2002, appellee had a substantial limitation in his ability to walk, but that in 2002, appellee no longer had a substantial impairment. He stated that appellee had slowly improved.

{¶ 128} Burkey acknowledged receiving a letter from Dr. Hicks on March 5, 2002. In the letter, Dr. Hicks stated that appellee recently underwent an FCE. Dr. Hicks stated that appellee was not capable of returning to his previous job category because it required heavy physical activity. However, he stated:

{¶ 129} "[Appellee] would, however, satisfy a job demand in the high lift, carry 10 through 50 pounds and intermediate reach, left and right with handling and sitting. * * * He would benefit from a job that would allow him to change position from sitting to standing frequently throughout the workday and, in general, can perform at a medium physical demand level."

{¶ 130} On April 22, 2002, Burkey wrote a letter to Dr. Hicks requesting additional clarification with respect to appellee's mobility. However, by that time, appellants had already terminated appellee's employment.

{¶ 131} Burkey admitted that he looked only for a sedentary job for appellee, even though Dr. Hicks stated that appellee could perform medium-level work. Burkey stated that he did so because he relied on another letter from appellee's doctor stating that appellee could perform only sedentary work. However, Burkey admitted that the letter he relied on was not as current as the March 2002 letter. Burkey also admitted that the medical evidence that he relied on in determining that appellee was incapable of returning to his job was from 2001.

{¶ 132} Burkey further testified that in January 2001, he offered appellee a cycle-counting job. At that time, Burkey did not think that appellee had a substantial limitation in his ability to walk, but in his ability to lift—even though he had a foot injury. Furthermore, when appellants offered appellee the cycle-counting job, they offered to provide him help with lifting and reaching for heavy materials. Appellee stated that he declined this job because at that time, early 2001, he was not yet able to come back to work.

{¶ 133} Appellee also agreed with a letter from a Dr. David Kay dated April 12, 2001, in which Dr. Kay stated that appellee should spend only minimal time on his feet and should not lift more than ten pounds. Appellee agreed that the letter portrayed his condition then. And appellee agreed that in May 2001, he was still in a great deal of pain and could not stand while coaching softball.

Burkey received this letter. Burkey stated that this was the first time appellants realized how limited appellee's mobility was.

{¶ 134} Furthermore, appellee acknowledged that in August 2001, an independent medical examiner concluded that he had reached maximum medical improvement ("MMI"). At this point, appellee still complained of severe pain in his foot, knee, and low back and reported that it was difficult to put weight on his foot and to wear a shoe. However, appellee appealed the MMI finding. He stated that he filed the appeal in order to continue his temporary total workers' compensation benefits. As a result of the MMI finding, appellee received notification that his temporary total benefits would end on October 31, 2001. However, as a result of appellee's appeal, his benefits continued until December 3, 2001. As part of his MMI appeal, appellee submitted a form filled out by Dr. Hicks on September 25, 2001. This form stated that appellee was not able to return to his inspector job. It also stated that appellee was not able to return to other employment, including light duty, alternative work, modified work, or transitional work. The form also listed appellee's estimated return to work date as December 31, 2001.

{¶ 135} Burkey also testified that he received a copy of the independent medical examiner report. He testified that from this report, he learned that appellee's standing and walking should be limited to 15–minute intervals. Burkey also referred to an August 22, 2001 letter from Dr. Hicks, in which Dr. Hicks stated that appellee was going to begin a new treatment that would most likely enable him to return to a sedentary position.

{¶ 136} Additionally, Burkey testified that when appellee called him in November 2001 to come back to work, appellee did not state that he was fully recovered, only that he would work through the pain. Burkey stated that appellee was concerned because his temporary total disability benefits were about to run out.

{¶ 137} Appellee also acknowledged several progress notes from Keystone Rehabilitation Systems dated in late February and early March 2002. The notes stated that appellee had reported that after completing cardio work, he felt like his foot was on fire. However, appellee stated that his work-hardening therapy was much more intense than a day of work at Chester Hoist.

{¶ 138} Karen Rapp, a physical therapy assistant at Keystone who worked with appellee, testified about his therapy. She stated that in February 2002, appellee reported burning in his foot. Further, Rapp acknowledged that a February 20 note stated that appellee could not tolerate ambulating between activities and a February 27 note stated that there was a lack of progress. However, Rapp clarified this statement by agreeing that appellee just wanted to rest a few minutes between exercises, such as between the treadmill and the Stairmaster. Rapp also testified that appellee significantly improved over the course of his treatment. She stated that he completed 75 percent of his goal in the categories

of range of motion and strength. Rapp testified that 75 percent was a good mark. But appellee did not meet his goal in eliminating pain. She further stated that appellee indicated to her that he wanted to return to work.

{¶ 139} Blaise Obritz, an occupational therapist who worked with appellee, testified about appellee's condition. Obritz conducted appellee's FCE. An FCE examines how well a person can do certain work-related activities such as lifting, walking, squatting, bending, and range of motion. The information gathered by the therapist is then run through a computer program that comes up with performance levels for the person in the various activities, including sedentary, light, medium, heavy, and very heavy. The FCE also began with a self-evaluation during which the person rated on a scale of one to ten how he was able to perform certain activities.

{¶ 140} In the self-evaluation, appellee reported in the category of standing and walking that he was only a one out of ten. However, appellee later explained that when he filled out that evaluation, he was confused about the questions. For instance, when it asked how long he could stand, he thought it meant at one time without moving, not throughout the day.

{¶ 141} Based on appellee's FCE, Obritz concluded that appellee can satisfy a medium physical demand level. Additionally, Obritz stated that appellee would benefit from a job that would allow him to change positions from sitting, to standing, to leaning throughout the day. Obritz stated that based on the FCE, appellee was not limited to sedentary work. Burkey testified that the FCE indicated to him that appellee was very limited in his capabilities.

{¶ 142} Importantly, Obritz testified that the FCE did not account for accommodations. Nor did the self-evaluation account for accommodations. Additionally, it did not account for using hoists or having others to help in lifting things.

{¶ 143} Appellee acknowledged that he applied for and receives Social Security benefits. However, Social Security does not account for reasonable accommodations.

{¶ 144} Based on the above evidence, we cannot conclude that the jury clearly lost its way and created a miscarriage of justice in finding that appellee could safely and substantially perform the essential functions of the inspector's job with reasonable accommodations.

{¶ 145} First, although Burkey testified that the essential functions of the inspector's job include walking and lifting, he was the only one who so testified. Fulk and appellee, both of whom have actually performed the job, testified that the essential job functions are inspecting and measuring. Additionally, Anderson, the vocational expert, agreed with Fulk and appellee. And he explained that exertional requirements, such as walking and lifting, are different

from essential functions, which are what a person actually gets paid to do—in this case, inspecting.

{¶ 146} Second, although the evidence was conflicting, sufficient evidence was presented for the jury to conclude that appellee could perform the essential functions with a reasonable accommodation. Appellee clearly made an accommodation request to Burkey that he be allowed a few minutes to rest his foot and adjust his boot when his foot hurt. Even Burkey admitted this. Furthermore, appellee testified that he would be able to perform the job, and Fulk agreed. And both Fulk and Anderson testified that appellee could lean, bring parts to his desk to check, and occasionally use a stool, all without interfering with his inspections.

{¶ 147} Third, while the medical evidence was conflicting as to whether appellee could physically handle the inspector's job, it was up to the jury to determine which evidence to believe. The medical evidence that stated that appellee could not perform the inspector's job failed to take into consideration any reasonable accommodations whatsoever. This was significant because appellee never contended that he could do the job without an accommodation, only with an accommodation.

{¶ 148} Finally, the evidence demonstrated that Burkey was the central figure in appellee's termination. Burkey was the one appellee went to with his accommodation request. Burkey was the one who claimed to have examined all accommodations and concluded that there were no reasonable accommodations. Burkey was the one who reviewed appellee's medical evidence. And it seems that Burkey was the one who ultimately fired appellee. Thus, the evidence supports the jury's finding that Burkey was liable, along with Chester Hoist.

{¶ 149} Based on the foregoing, the jury's verdict was not against the manifest weight of the evidence. Accordingly, appellants' sixth assignment of error is without merit.

{¶ 150} Appellants' first assignment of error states:

{¶ 151} "The trial court erred as a matter of law when it denied defendants-appellants' motion for directed verdict on plaintiff-appellee's claim for punitive damages."

{¶ 152} Appellants argue that the trial court should not have allowed the issue of punitive damages to go to the jury. They claim that appellee presented no evidence of actual malice, which was necessary for an award of punitive damages. Appellants assert that the evidence demonstrated that they had tried to bring appellee back to work for years before terminating him. Furthermore, they contend that appellee's own medical evidence established that he could not perform the essential functions of his job. Finally, appellants assert that the

evidence demonstrated that they would have kept appellee on as an employee on leave, but appellee demanded a final decision from them.

{¶ 153} An appellate court reviews a trial court's ruling on a motion for directed verdict de novo because it presents a question of law. *Pearn v. DaimlerChrysler Corp.* (2002), 148 Ohio App.3d 228, 240, 772 N.E.2d 712. A motion for directed verdict tests the sufficiency of the evidence at trial, not the weight of such evidence or the credibility of witnesses. Id. The court shall grant a motion for a directed verdict when, "after construing the evidence most strongly in favor of the party against whom the motion is directed, [it] finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party." Civ.R. 50(A)(4).

{¶ 154} "The purpose of punitive damages is not to compensate a plaintiff, but to punish and deter certain conduct." *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 651, 635 N.E.2d 331. The Ohio Supreme Court explained how punitive damages should be looked at as follows:

{¶ 155} "The focus of the award should be the defendant, and the consideration should be what it will take to bring about the twin aims of punishment and deterrence as to that defendant. We do not require, or invite, financial ruination of a defendant that is liable for punitive damages. While certainly a higher award will always yield a greater punishment and a greater deterrent, the punitive damages award should not go beyond what is necessary to achieve its goals. The law requires an effective punishment, not a draconian one." *Dardinger v. Anthem Blue Cross & Blue Shield,* 98 Ohio St.3d 77, 2002-Ohio-7113, 781 N.E.2d 121, at ¶ 178.

{¶ 156} A jury may award punitive damages only upon a finding of actual malice. *Calmes v. Goodyear Tire & Rubber Co.* (1991), 61 Ohio St.3d 470, 473, 575 N.E.2d 416. "Actual malice" has been defined as " '(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. (Emphasis sic.)' " Id., quoting *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus. The amount of punitive damages awarded may be excessive when it is determined to have been the product of passion and prejudice. *Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 40, 543 N.E.2d 464. But as long as the punitive damages award is not the result of passion and prejudice and is not the result of a legal error, generally it is not within the province of a reviewing court to substitute its view for that of the jury. Id.

{¶ 157} In addition to the evidence discussed above, the following evidence is relevant to the issue of actual malice.

{¶ 158} Early on, when counsel asked Burkey about the essential job functions, Burkey stated that the fact that appellee lacked the ability to move around the plant was "the whole credence to this case." However, when asked whether he believed that appellee has a substantial limitation in the major life activity of walking, Burkey responded, "No." Later, counsel asked Burkey, "I thought before you had said that mobility was the reason he couldn't really come back to work in 2002. That lifting wasn't much of an issue?" This time, Burkey stated that they were both issues. Then when asked why Chester Hoist could not accommodate appellee with lifting when he wanted to come back to work, Burkey stated that they could have accommodated appellee with his lifting restrictions.

{¶ 159} In a letter dated January 12, 2001, Burkey wrote: "Before his injury, Mr. Sicklesmith was a quality control inspector. This position required him to move about our facility conducting in-process inspections and inspections of components. Some of this inspection work required lifting relatively heavy components. Therefore, we believe it might not be feasible for Clarence to return to inspection full time due to the lifting required." Burkey admitted that although appellants knew appellee had a foot injury, they believed he could not return to work in 2001 because of a lifting issue, not a mobility issue.

{¶ 160} After appellee made his accommodation request, Burkey wrote an e-mail to Robert Myers, the vice president of human resources at Columbus McKinnon, seeking his advice. In this e-mail, Burkey spent a significant amount of time detailing how much money appellee had cost Chester Hoist in increased workers' compensation premiums. He stated that appellee's claim had cost the company $75,000 to $100,000 per year in extra premiums. Burkey also explained that he tried to bring appellee back to work in order to try to control the money he was costing the company. Burkey admitted that he did not inform Myers that appellee had requested an accommodation. Instead, Burkey told Myers that appellee was requesting "light duty," even though appellee never requested light duty. Burkey did not put anything in the e-mail about appellee's accommodation request to rest his foot and loosen his boot. Additionally, Burkey wrote:

{¶ 161} "We believe that we are only obligated by law to bring Clarence back if he can return to his former job. Also, we believe that we fulfilled our moral obligation to this employee when we offered to work with him over the past 3 years to get him back to work. We are inclined to advise Clarence that since he cannot return to his former occupation, and since he repeatedly refused our attempts to bring him back to work and accommodate his limitations prior to his benefits being terminated, we will not be able to offer him a position at this time."

{¶ 162} Burkey also admitted that appellee's workers' compensation claim was very costly to Chester Hoist and that no one had ever filed a claim of this magnitude before.

{¶ 163} Additionally, after appellants terminated appellee, appellee had a meeting with Burkey and the company's attorneys regarding his grievance. Appellee secretly recorded that meeting. The tape was played for the jury. On the tape, Burkey makes statements to appellee regarding his workers' compensation claim such as, "It cost us half million bucks this claim," and "[W]e've paid through the nose." Burkey also made several statements to appellee that seemed to imply that appellee was defrauding the Bureau of Workers' Compensation. Burkey also suggested in a threatening way that appellee might get charged with fraud.

{¶ 164} Appellee also testified about what Burkey said when he told Burkey he was ready to return to work. Burkey told appellee that he was a liability and had cost the company half a million dollars from his workers' compensation claim. When appellee asked again about his accommodation, Burkey told him that he cost the guys in the shop a thousand dollars on their profit sharing. Burkey also asked appellee whether he could guarantee that he would not get hurt again.

{¶ 165} Furthermore, Burkey scheduled a meeting with appellee for March 28, 2002. Burkey pushed the meeting back to April 8. When he went into the meeting, appellee expected to discuss his return to work. Burkey had led appellee to believe that the meeting was to negotiate his return to work. But instead, Burkey handed him a discharge letter. Before this time, neither Burkey nor anyone else at Chester Hoist had talked with him about alternatives to his requested accommodation. Nor did anyone explain to him why his requested accommodation would not work.

{¶ 166} Additionally, on July 22, 1997, the plant manager at the time wrote a letter stating that appellee was out on workers' compensation and would be able to return to his position at Chester Hoist when workers' compensation released him. Appellee stated that he relied on this letter.

{¶ 167} Actual malice may be inferred by conduct and surrounding circumstances showing such conscious disregard of the rights of others. *Kalbfell v. Marc Glassman, Inc.* 7th Dist. 02–CO–5, 2003-Ohio-3489, 2003 WL 21505264, at ¶ 48. Here, Burkey's words and actions demonstrated his conscious disregard for appellee's rights. On more than one occasion, Burkey emphasized how much money appellee's worker's compensation claim had cost Chester Hoist. When he wrote the e-mail to Myers, which should have focused on appellee's accommodation request, Burkey focused on the half a million dollars that appellee had cost the company. Furthermore, at that time, before even exploring appellee's

accommodation request, Burkey was already predisposed to terminate appellee. Additionally, at the meeting after appellee was terminated, Burkey again emphasized the money appellee had cost the company. Moreover, he went as far as to impliedly threaten appellee with workers' compensation fraud. And at trial, Burkey's reasons for why appellee could not return to the inspector's position were dubious at best. When mobility accommodations were mentioned, Burkey seemed to switch the issue to lifting. When lifting accommodations were mentioned, Burkey seemed to revert back to mobility.

{¶ 168} After construing the evidence most strongly in favor of appellee, as we are required to do, reasonable minds could conclude that appellants had acted with actual malice in terminating appellee. Accordingly, appellants' first assignment of error is without merit.

{¶ 169} Appellants' seventh assignment of error states:

{¶ 170} "The trial court erred as a matter of law when it denied defendants-appellants' motion for summary judgment on plaintiff-appellee's disability discrimination claim."

{¶ 171} Appellants filed a motion for summary judgment on all counts of appellee's claim. The trial court granted the motion as to all counts except for the disability-discrimination count. As to that claim, the court found that genuine issues of material fact existed regarding whether appellee was handicapped or considered to be handicapped, whether appellee could perform his job safely and substantially with or without reasonable accommodation, and whether Burkey was individually liable as appellee's supervisor.

{¶ 172} Appellants argue that this case should never have proceeded to trial.

{¶ 173} First, they assert that there was no basis for Burkey's individual liability under R.C. Chapter 4112. They point out that appellee admitted in his deposition that Burkey was simply doing his job as Chester Hoist's manager and did not act alone in deciding to terminate him.

{¶ 174} Second, appellants assert that the court should have granted summary judgment with respect to Chester Hoist because appellee failed to present evidence that he was a "qualified individual with a disability" at the time of his discharge.

{¶ 175} Finally, appellants point out that appellee received Social Security Disability Insurance ("SSDI") benefits from 1998 until at least July 2003, long after he was terminated. And while the receipt of SSDI benefits does not necessarily preclude a claim that one can perform the essential functions of a job, the burden is on the employee to demonstrate how he can perform the job.

{¶ 176} The Ohio Supreme Court has held that "[a]ny error by a trial court in denying a motion for summary judgment is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion was made." *Continental Ins. Co. v. Whittington* (1994), 71 Ohio St.3d 150, 642 N.E.2d 615, syllabus. In reaching this holding, the court agreed with a detailed analysis of the issue by an Illinois appellate court as follows:

{¶ 177} " 'The contention that the trial court erred in denying the motions for summary judgment [filed by plaintiff Home Indemnity, an insurer, against defendant Reynolds & Co., the insured] poses an unusual question. Does a party, whose motion for summary judgment is denied, have the right to have the denial of its motion reviewed after the case goes to trial and a verdict is returned against it? * * *

{¶ 178} " ' * * * [W]e will, for the purpose of reaching the substance of the issue presented, make two assumptions: (a) that one or both of its [Home Indemnity's] motions should have been granted and (b) that the verdict in favor of Reynolds was not against the weight of the evidence. Obviously, under these assumptions the evidence must have differed at the time of the motions and at the time of the trial. Obviously, a greater quantity or a better quality of evidence was produced by Reynolds at the trial than on the motions.

{¶ 179} " 'An incorrect ruling [denying Home Indemnity's motions] deprived the moving party of a judgment it should have had. It could not immediately appeal from the orders denying its motions because the orders were not final and appealable. * * * If it cannot appeal after judgment, * * * what remedy does it have? To deny a review seems to be unjust. But to grant it would necessarily result, under our first assumption, in the finding that the judgment entered upon the verdict should be set aside and that judgment should be awarded upon one of the motions. This would be unjust to the party that was victorious at the trial, which won judgment after the evidence was more completely presented, where cross-examination played its part and where witnesses were seen and appraised.

{¶ 180} " 'The greater injustice would be to the party which would be deprived of the jury verdict. Otherwise, a decision based on less evidence would prevail over a verdict reached on more evidence and judgment would be taken away from the victor and given to the loser despite the victor having the greater weight of evidence. This would defeat the fundamental purpose of judicial inquiry.

{¶ 181} " 'We hold that if a motion for summary judgment is improperly denied the error is not reversible for the result becomes merged in the subsequent trial. Therefore, even if an examination of the affidavits, counter-affidavits, depositions and exhibits were to lead to the conclusion that either one or both of Home

Indemnity's motions should have been granted it would avail nothing, for the error cannot be reviewed.'" Id. at 157, 642 N.E.2d 615, quoting *Home Indemn. Co. v. Reynolds & Co.* (1962), 38 Ill.App.2d 358, 365–67, 187 N.E.2d 274.

{¶ 182} The court concluded that whether the trial court properly denied the summary judgment motion became irrelevant, and the error, if any, was corrected when the jury determined the issues at trial. Id. at 157–58, 642 N.E.2d 615.

{¶ 183} Based on this holding and reasoning, appellants' argument is without merit. Appellants now raise only issues of fact regarding the evidence. Courts have recognized that *Whittington's* holding does not apply when the denial of summary judgment is predicated on a pure question of law. See *Evans v. Dayton Power & Light Co.*, 4th Dist. No. 03CA763, 2004-Ohio-2183, 2004 WL 928297; *First Capital Corp. v. G & J Industries, Inc.* (1999), 131 Ohio App.3d 106, 721 N.E.2d 1084. But in this case, appellants are not arguing that based on a purely legal question, the trial court should have granted summary judgment. They argue instead that *based on the evidence*, the court should have granted summary judgment on the disability-discrimination claim. Accordingly, appellants' seventh assignment of error is without merit.

{¶ 184} For the reasons stated above, the trial court's judgment is hereby affirmed.

Judgment affirmed.

WAITE and DeGENARO, JJ., concur.