[Cite as *O'Donnell v. N.E. Ohio Neighborhood Health Servs., Inc.*, 2020-Ohio-1609.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JAMES F. O'DONNELL,  :

    Plaintiff-Appellee,  :

                     No. 108541

    v.  :

NORTHEAST OHIO NEIGHBORHOOD :
HEALTH SERVICES, INC.,

    Defendant-Appellant.  :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 23, 2020

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-17-881337

---

### *Appearances:*

Brennan, Manna & Diamond, L.L.C., and Christopher B. Congeni and Daniel J. Rudary, *for appellee.*

The Law Offices of Vincent T. Norwillo, L.L.C., and Vincent T. Norwillo, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Defendant-appellant Northeast Ohio Neighborhood Health Services, Inc. ("NEON") appeals the trial court's judgment after a jury returned a verdict in favor of plaintiff-appellee James O'Donnell and against NEON on O'Donnell's age

discrimination claims under R.C. 4112.02(A) and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. 621 et seq. For the reasons that follow, we affirm.

**Procedural and Factual Background**

{¶ 2} NEON is a not-for-profit, federally qualified health center ("FQHC") network of community health centers that provides outpatient primary care services in the Greater Cleveland area. O'Donnell is NEON's former chief financial officer ("CFO"). O'Donnell was hired by NEON in June 1996 as its director of fiscal services. In December 1999, O'Donnell was promoted and for the next 18 years, worked as NEON's CFO. Since approximately 2003, O'Donnell reported to Willie Austin, the organization's president and chief executive officer ("CEO").

{¶ 3} On January 9, 2017, Austin informed O'Donnell that he was terminated. At the time of his termination, O'Donnell was 60 years old. O'Donnell had not received any formal written disciplinary or corrective action prior to his termination, and no explanation was provided to O'Donnell for his termination at the time of his termination. A few days later, O'Donnell was replaced by 35-year-old George Voss, who had previously served as NEON's director of fiscal services.

{¶ 4} On June 6, 2017, O'Donnell filed a complaint against NEON, Austin and Perry Murdock, NEON's director of human relations, (collectively "defendants") in the Cuyahoga County Court of Common Pleas, alleging that he had been

terminated because of age in violation of R.C. 4112.02(A).[1]  He also filed a complaint

with the United States Equal Employment Opportunity Commission ("EEOC").  On

his EEOC intake questionnaire, executed on June 7, 2017, O'Donnell checked boxes

for discrimination based on "age" and "retaliation."  In response to the question,

"[w]hat happened to you that you believe was discriminatory," O'Donnell stated:

> A) Date: 01/09/2017 Action: Called into a meeting at 4:00 p.m. was told that today was my last day at organization.  No reason given. Escorted from premises by armed Cleveland Police Officer!
>
> Name and Title of Person(s) Responsible: Willie F. Austin, Pres & CEO
>
> B) Date: 01/09/2017 Action:  Willie F. Austin, Pres & CEO was the person who called me into the meeting, and told me it was my last day. Also present was HR Director, Mr. Perry Murdoch [sic].

**{¶ 5}**    In response to the question, "[w]hy do you believe these actions were

discriminatory," O'Donnell stated:

> First, I believe the Discharge was in retaliation to my offering to report to the Board of Directors directly, instead of the Pres & CEO, during the November 2016 Board Finance Committee meeting.  [The second reason was redacted.]  Third, I believe the CEO wanted to replace me with a younger CFO, that he could intimidate.

**{¶ 6}**    After he received a right-to-sue letter from the EEOC, O'Donnell

amended his complaint to assert an additional claim of age discrimination against

NEON under the ADEA.  O'Donnell sought to recover compensatory damages,

including lost wages and benefits (both past and future), noneconomic damages

---

[1] O'Donnell's original complaint included a claim for race discrimination as well. On June 14, 2017, O'Donnell amended his complaint to remove that claim.

including emotional distress and loss of enjoyment of life, consequential damages, punitive damages and attorney fees and costs.

**Evidence Presented at Trial**

**{¶ 7}** On February 4, 2019, the case proceeded to a jury trial. At trial, O'Donnell claimed that he had been terminated due to his age because he had the experience to ask "tough questions" regarding the finances of several projects NEON was funding through a subsidiary and would be more difficult to manipulate than someone younger. NEON claimed that O'Donnell was terminated due to a series of incidents of insubordination and disrespect that culminated with O'Donnell's conduct at a November 2016 board meeting. A summary of the evidence presented at trial follows.

**NEON's 2015 Audit**

**{¶ 8}** As CFO, one of O'Donnell's job duties was to assist in the external auditing of NEON's financial statements. In the spring and summer of 2016, O'Donnell was working with Plante and Moran, the accounting firm NEON had retained to perform an audit of its 2015 financial statements. During the audit process, an issue arose regarding the lack of sufficient detail in invoices for certain expenditures by Community Integrated Services, Inc. ("CIS"), a for-profit subsidiary of NEON, to determine whether the expenditures should be capitalized or expensed (the "invoice detail issue"). NEON had been loaning money to CIS to get several projects, including a veteran's housing project and an eastside market project, up and running.

**{¶ 9}** O'Donnell had previously expressed concerns regarding NEON's involvement in these projects because they were "outside the line of the FQHC business" for which NEON received federal funding. Austin claimed that O'Donnell lacked sufficient information regarding the projects to be asking questions about them. Austin testified that he wrote a letter to "the law firm that is hired by the federal government to represent FQHCs" and was told it did not matter what projects the company pursued so long as it was "not using federal dollars" for the projects. NEON's involvement in these projects was approved by its board of trustees.

**{¶ 10}** As it related to the 2015 audit, the invoice detail issue came to a head in or around May 2016. On May 24, 2016, O'Donnell sent an email to Austin regarding the status of the financial audit. O'Donnell advised Austin that the auditors would not be presenting at NEON's June board meeting and wanted to meet with Arthur Fayne to discuss how costs were being assigned to NEON projects. Fayne's company, Business Development Concepts ("BDC"), was the managing agent for CIS and served as the intermediary between NEON and CIS with respect to the projects. The auditors had requested additional documentation regarding funds being paid to BDC to determine whether the expenditures should be properly capitalized or expensed. Austin testified that he and the board chairman had recently met with the auditors and that the senior audit partner had informed them, at that time, that the auditors had all of the information they needed to close the audit. Austin responded: "These continued delays are unacceptable, as the requests

seem unending; one leading to another. The auditors have indicated to me and the Board Chair that they had the information needed to close out. That is what they need to do."

{¶ 11} In a May 25, 2016 email to Austin, O'Donnell stated:

I am pretty confident you misinterpreted what would happen subsequent to your meeting with [the auditors]. You may have communicated "what" was transpiring; but they still needed to test the "transactions" of what was transpiring to confirm your explanations. That's what auditing is!

It is notable to see that the same transactions requested from Arthur, yielded **no actual proof** that the "payments" were being made to his subcontractors, only [i]nvoices, that quite frankly any eighth grade could recreate on a printer! However, in his defense, I already chastised the Auditor's [sic] for not being more "specific" on what they needed, (i.e. cancelled checks or bank statements showing the wires), from him. However, with him charging us for "Financial Services," they may have assumed what an auditor required, should be known by him?

Let me speak frankly, when you divert a million dollars a year, to an unproven entity to act on your behalf[,] there is going to be heightened scrutiny. You are smart enough to understand this. We are in the second year of million dollar losses, that nonprofit Board members may not fully comprehend? A Board's responsibility of "Duty of Care," will be questioned by outside reviewers.

I am speculating that the Plante & Moran Technical Reviewers came back to Mark and said just meet with BDC, since they failed to provide proof that these invoices are actually being paid. I think it is a simple solution that we should comply with. The alternative might be to see proof of payments on a sample of items?

So which might you prefer? I can go back to them with your preference. Or you can speak directly to them?

Let me know?

(Emphasis sic.)

{¶ 12} The following day, Austin responded to O'Donnell's email, copying Fayne, as follows:

> Be very careful about the way you communicate with me, especially questioning my intelligence and/or ability to understand something you were not present to hear, question or response [sic]. Insolence seems to be something you hold in high regard. However[,] you are not going to address me any way you like without there being consequences. My concern about this whole process is the lack of specificity and the amount of time already expended, as though a fishing expedition is being conducted in order to discover more questions to ask. In all my years with this organization, I am not aware of one instance where a contractor or vendor of any kind was asked to produce proof of payment for invoices submitted of any amount.

> As insulting as it may be to Arthur Fayne, I will present this latest request to him and see whether this eighth grader is willing to meet or provide proof of payment on some "sample of items." At any rate, you can advise the audit firm that I expect a draft to send to board members next week.

{¶ 13} O'Donnell stated that his goal with respect to the audit was to "take the easy way out, give the auditors what they want and what they need" but that he was "not quite sure [Austin] grasped the full scope of the easy way out." O'Donnell testified that he was not in the meeting with the outside auditors and that "diversion" was a "poor choice of terms, in retrospect." He indicated that there was, in fact, no "diversion" of funds and that the $1 million referred to expenses paid during the predevelopment phase of the projects, expenses that had been approved by the board of trustees. O'Donnell stated, however, that NEON was spending a lot of money on projects that were not "coming to fruition" and that, "as an older senior staff person," he needed to ask "the tough questions."

{¶ 14} In June 2016, O'Donnell received a performance review from Austin. O'Donnell received ratings of "meets job requirements" or "exceeds job requirements" in every category in which he was reviewed, with an overall rating of "meets job requirements." However, there were some areas in which suggestions were made for improvement. Under the heading, "[a]reas to work on," Austin stated: "Be more sensitive to others' feelings and how they react to situations. When communicating, consider the likely impact of your message and plan your words to ensure maximum understanding and acceptance. Check for others' reactions and offer your support if needed." With respect to "[c]ooperation," Austin stated:

> James demonstrates and promotes cooperation when working in group situations. He usually establishes and maintains good working relationships. He assists and supports his co-workers. James takes responsibility to help resolve conflicts. However, there have been a number of occasions when he exhibited a lack of tact or consideration for others. Additionally, he would be easier to work with if he projected a more positive outlook and pleasant manner.

{¶ 15} On August 2, 2016, Plante & Moran sent an end-of-audit letter to Austin, O'Donnell and NEON's board of trustees summarizing the results of the audit. The auditors noted a "significant deficiency" in the company's internal controls related to the documentation of expenses for CIS:

> Development Projects in Progress — We noted that there are several projects that are in pre-development stages. The invoices received by the Company related to these projects [do] not appear to contain sufficient detail necessary to determine proper accounting treatment (i.e., expense vs. capitalize) for these expenditures. While we did note that these projects are all in pre-development stages during the year, and that related costs were expensed in accordance with GAAP, there is a risk that expenditures incurred as these projects move to development stages in the future may not be appropriately accounted

for in the consolidated financial statements based on the current practice. We recommend that the finance department obtain sufficient supporting documentation relating to the expenditures incurred for these projects in order to make an accurate assessment of proper accounting for the transactions.

{¶ 16} In other words, there was no issue with the accounting treatment of the 2015 expenditures. Because the projects were in the predevelopment stage, the expenditures invoiced to CIS and paid by NEON were all expensed. The issue identified by the auditors related to the future, i.e., expenditures incurred as the projects moved into the development phase might not be appropriately accounted for in the financial statements if additional invoice detail was not provided.[2] O'Donnell confirmed that the auditors had no issue with the existence or the amount of the transactions involving BDC or CIS, "[o]nly the documentation."

### The November 2016 Board Meeting and the Decision to Terminate O'Donnell

{¶ 17} At each monthly board meeting, O'Donnell gave a CFO report regarding NEON's financial statements. Beginning in September 2016, the board's finance committee began holding monthly meetings immediately before the monthly board meetings. Austin, O'Donnell, Karen Butler (NEON's chief operating officer), Reverend Rodney Thomas (the board's chairman) and two other board members attended the November 9, 2016 finance committee meeting. The 2015

---

[2] This was not the first time the invoice detail issue had been raised. Following the 2014 audit, NEON's auditors had made similar recommendations to cure issues with invoice detail. Those recommendations were followed and, as a result, the invoice detail issue was not as serious in 2015 as it had been in 2014.

audit results were discussed at the November 9, 2016 finance committee meeting and the full board meeting that followed the finance committee meeting.

{¶ 18} Conflicting testimony was presented at trial regarding what happened at these November 2016 meetings. Austin testified that during O'Donnell's CFO report at the board meeting, one of the board members asked O'Donnell a question. According to Austin, O'Donnell responded, "if you want honest reporting, then you will allow me to report directly to you instead of Mr. Austin." Reverend Thomas offered a similar version of events. He testified that during the CFO report, a board member asked a question regarding "the spending expenditures for CIS." According to Reverend Thomas, O'Donnell responded, "if you have a question about the expenditures, I will answer only to the board and not to Mr. Austin." There was no mention of this interaction in the November 2016 board meeting minutes.

{¶ 19} O'Donnell admitted that he had offered to report to the board directly but claimed that he had done so at the November 2016 finance committee meeting, not at the board meeting. O'Donnell testified that after Reverend Thomas began questioning him regarding the significant invoice detail deficiency noted in the audit report, he offered to report to the board directly instead of to Austin. O'Donnell stated that he did so to "kind of appease" Reverend Thomas because, at that point, Reverend Thomas was "pretty hot under the collar" regarding NEON's 2016 Health Resources and Services Administration ("HRSA") site visit report, which the committee had discussed before discussing the audit report. O'Donnell claimed that the HRSA report had been critical of board governance and that Reverend Thomas

had been "criticizing" Austin and Butler because he felt he had not received sufficient information related to the HRSA site visit issues from management.

{¶ 20} O'Donnell's offer was "unequivocally" rejected. O'Donnell testified that Austin and Reverend Thomas informed him that Austin was the only NEON employee who reported to the board. O'Donnell indicated that the discussion got "a little heated" but that no one informed him after the meeting that they believed he had been insubordinate or disrespectful.

{¶ 21} Austin testified that he was "dumbfounded" and "livid" by O'Donnell's conduct at the November 2016 board meeting, which Austin interpreted as implying that he was dishonest and was "orchestrating and slanting the information coming to the board." Reverend Thomas testified that he found O'Donnell's comments to be "disrespectful," "unjustified" and "an insubordinate act" and recommended to Austin that O'Donnell be terminated.

{¶ 22} Austin testified that he was the sole decisionmaker with respect to O'Donnell's termination. He stated that after the board meeting, he decided that O'Donnell "needed to go work for somebody else" but that he "elected not to tell [Murdock]" (or anyone else) of his decision at that time. Austin claimed that his decision to terminate O'Donnell was the result of "a progression of things," including multiple prior instances of "disrespect" and "insubordination" by O'Donnell, and that O'Donnell's conduct at the November 2016 board meeting was simply the "straw that broke the camel's back." Although he made the decision to terminate

O'Donnell after the November 2016 board meeting, Austin stated that he decided not to "implement" the termination until after the holidays.

**O'Donnell's Merit Salary Increase**

{¶ 23} On December 6, 2016, Austin authorized a "merit salary increase" for O'Donnell. Austin testified that a decision was made in February 2016 to give "across the board" salary increases to all employees on their anniversary dates. O'Donnell's anniversary date was in December. According to Austin, all employees received an increase of some kind unless they received an unfavorable evaluation and because O'Donnell was "still on the payroll" on his anniversary date, he was entitled to the salary increase. Austin stated that even though he had issues with O'Donnell's performance and planned to terminate him, he "signed off" on the increase because a month's salary increase "wasn't enough to make an issue over."

**O'Donnell's Termination**

{¶ 24} On January 9, 2017, Austin asked Murdock and O'Donnell to come to his office for a meeting. Murdock testified that he did not know the purpose of the meeting and was already in Austin's office when O'Donnell arrived. O'Donnell testified that he assumed Austin wanted to talk about the company's financial statements in anticipation of an upcoming board meeting.

{¶ 25} When O'Donnell arrived, Austin told O'Donnell he was being terminated. Austin did not state a reason for his termination. O'Donnell stated that he was "shocked and surprised." He testified that no one had raised any issue regarding his performance or conduct prior to his termination and that he had never

received any type of "written write up" or other disciplinary action for "performance or behavior problems" while working for NEON. With respect to his June 2016 performance review, O'Donnell stated that Austin did not discuss any "problem areas" or areas for improvement or change with him. O'Donnell told Austin, "you'll hear from my attorney" and immediately left Austin's office.

{¶ 26} Murdock and a security guard escorted O'Donnell back to his office. O'Donnell packed up his belongings, said goodbye to a coworker and was escorted out of the building.

{¶ 27} Although O'Donnell later claimed he had been terminated because of his age, he testified that neither Austin nor anyone else at NEON had ever made any comments about his age.

{¶ 28} Murdock testified that he did not know why O'Donnell had been terminated and could not state whether O'Donnell had been terminated because of his age. He testified: "I knew nothing about age as it relates to Mr. Austin's decision." Murdock stated that he had no knowledge of when Austin made the decision to terminate O'Donnell and had no involvement in the hiring of Voss as O'Donnell's successor. According to Murdock, "[Austin] made the decision and we were notified." Murdock did not question Austin about his decision to terminate O'Donnell and hire Voss.

{¶ 29} Austin disputed Murdock's claim that he never informed Murdock why he was terminating O'Donnell. He testified that he had informed Murdock why O'Donnell was being terminated and that Murdock was "mistaken" and "just didn't

remember." Austin testified that he did not give O'Donnell a reason for his termination at the time of his termination because O'Donnell "didn't wait for one." Austin stated that if O'Donnell had stayed in Austin's office after Austin advised him he was being terminated, Austin would have explained his decision.

**NEON's Discipline Policy**

{¶ 30} O'Donnell presented evidence that his termination was not in accordance with company policy. Murdock testified that NEON's discipline policy, set forth in its employee handbook, is a progressive discipline policy. The policy distinguishes between "minor" rule violations and "major" rule violations (which are "considered the equivalent of two minor violations") and states that "any combination of major and minor violations equaling or exceeding four minor violations will be sufficient justification for dismissal." "Insubordination" is classified a "major violation" under the policy. With regard to dismissal, the policy further states:

> An employee may be dismissed for a single act of gross under-performance, a series of four written warnings for infractions of NEON standards of conduct, or failure to complete an introductory or probationary period satisfactorily. Supervisors have the right to place an employee on immediate disciplinary suspension but can never dismiss an employee "on the spot."

> The supervisor initiates the dismissal by documenting in writing the reasons for dismissal and preparing a Personnel Change Form. The supervisor forwards the documentation to the next level manager for review and approval. The next level manager forwards the documentation to the Director of Human Resources who reviews the dismissal and compares it to other NEON cases. The Director of Human Resources then forwards the documentation to the CEO for review and approval. The CEO sends a letter of the dismissal to the

employee. Copies of all documentation of a suspension are maintained in the employee's personnel file.

{¶ 31} Murdock indicated that Austin had direct responsibility for seven employees, including O'Donnell. Murdock stated that NEON's discipline policy applied to "supervisors," i.e., that a supervisor could not terminate an employee "on the spot" because they needed the CEO's approval for termination, but that the CEO always has "the right to hire and fire."

{¶ 32} Austin described the company's policy as "a guide" and claimed that the various "steps" in NEON's discipline policy did not apply to his decisions because he was the president and CEO — not a department head, manager, center director or supervisor. In support of his view, he pointed to the section of the policy entitled "Sequence of Disciplinary Actions and Dismissal." That section provides, in relevant part:

> In determining appropriate disciplinary actions, the Department Heads, Managers, Center Directors and Supervisors shall consider the seriousness of the offense, any extenuating circumstances concerning the offense, and the employee's work record. The employee shall be provided the opportunity to present and explain his/her side of the case. The following are the forms of disciplinary action which supervisors or department heads may utilize. Nothing in this section shall be construed to abrogate the at-will employment relationship between NEON and its employees.

{¶ 33} According to Murdock, under NEON's discipline policy, if an employee is disciplined — even if there is only verbal corrective action — that discipline should be documented in the employee's file. Austin acknowledged that O'Donnell had never received any written disciplinary or corrective action when working at NEON. Austin stated that he was not required to document, and did not

document, the disciplinary or corrective action he took with respect to the executives who reported to him. He testified that his approach was to "call them on the spot" and "coach my professionals when they do something wrong." He explained: "I try to coach them because I don't want to run them away from the organization and create that high turnover that comes from petty documentation of the record. * * * I expect an executive like Jim O'Donnell to * * * heed * * * the warnings given him and respond accordingly. * * * The value, whether written or oral, is the same." Austin claimed that he had previously terminated other executive-level employees who reported directly to him without complying with the company's discipline policy.

**No Explanation for Termination**

{¶ 34} On January 17, 2017, Austin signed a personnel action form reflecting O'Donnell's "involuntary separation effective January 9, 2017." The space on the form for specifying the "violation" leading to disciplinary action was left blank. No other explanation for O'Donnell's termination was provided on the form.

{¶ 35} Austin stated that he did not identify a reason for O'Donnell's termination on the personnel action form related to his termination because (1) if he had done so, O'Donnell would not have been able to receive unemployment benefits and he did not want to be "that harsh" and (2) he knew there would be litigation over O'Donnell's termination and decided to "let the reason come out during the process of the lawsuit." NEON, however, later contested O'Donnell's attempt to obtain unemployment benefits.

**Motion for Directed Verdict**

{¶ 36} At the close of O'Donnell's case-in-chief, NEON moved for a directed verdict on O'Donnell's age discrimination claims on the ground that there was insufficient evidence to submit the issue of pretext to the jury, i.e., that there was insufficient evidence for the jury to reasonably find that the defendants' articulated reason for O'Donnell's termination was false and that age discrimination was the actual reason for his termination. The trial court granted the motion as to Murdock, but denied the motion as to Austin and NEON.

**The Jury's Verdicts**

{¶ 37} On February 12, 2019, the jury returned verdicts in favor of O'Donnell and against NEON only on O'Donnell's age discrimination claims under R.C. 4112.02(A) and the ADEA. The jury awarded O'Donnell $118,000 in back pay, $645,000 in front pay, $250,000 in compensatory damages and $50,000 in punitive damages. On May 1, 2019, the trial court awarded O'Donnell $190,738.50 in attorney fees and costs and entered final judgment. NEON appealed, raising the following six assignments of error for review:

> Assignment of Error 1: The trial court erred in denying NEON's motion for directed verdict.
>
> Assignment of Error 2: The trial court erred in entering judgment on the jury's verdict.
>
> Assignment of Error 3: The trial court erred in instructing the jury on plaintiff's damages claims for back pay and front pay.
>
> Assignment of Error 4: The trial court erred in permitting plaintiff to reference the criminal indictment of a non-party.

Assignment of Error 5: The trial court erred in permitting plaintiff to reference conclusions reached in a document from the Ohio Department of Job and Family Services.

Assignment of Error 6: The trial court erred in charging the jury on punitive damages and entering such an award.

{¶ 38} On August 8, 2019, O'Donnell filed a motion to dismiss the appeal as moot based on Neon's "voluntary satisfaction" of the trial court's judgment. This court denied the motion and stated that "[t]he issue whether a judgment is satisfied once the judgment amount is paid into escrow with the clerk of courts, but not distributed, may be addressed by the appellee in his brief on the merits."

**Law and Analysis**

**Voluntary Partial Satisfaction of Judgment through Garnishment**

{¶ 39} Before turning to the merits of this case, we first address O'Donnell's contention that this appeal is moot because the judgment has been satisfied through O'Donnell's garnishment of NEON's bank accounts prior to its posting of a supersedeas bond.

{¶ 40} It is a "well-established principle of law" that voluntary satisfaction of a judgment renders an appeal from that judgment moot. *Blodgett v. Blodgett*, 49 Ohio St.3d 243, 245, 551 N.E.2d 1249 (1990); *see also Francis David Corp. v. MAC Auto Mart, Inc.*, 8th Dist. Cuyahoga No. 93951, 2010-Ohio-1215, ¶ 11 ("'Voluntary satisfaction of judgment waives the right to appeal.'"), quoting *Brickman v. Frank G. Brickman Trust,* 8th Dist. Cuyahoga No. 81778, 2004-Ohio-2006, ¶ 8. As the Ohio Supreme Court explained in *Blodgett*:

"'Where the court rendering judgment has jurisdiction of the subject-matter of the action and of the parties, and fraud has not intervened, and the judgment is voluntarily paid and satisfied, such payment puts an end to the controversy, and takes away from the defendant the right to appeal or prosecute error or even to move for vacation of judgment.'"

*Blodgett* at 245, quoting *Rauch v. Noble*, 169 Ohio St. 314, 316, 159 N.E.2d 451 (1959), quoting *Lynch v. Lakewood City School Dist. Bd. of Edn.*, 116 Ohio St. 361, 156 N.E. 188 (1927), paragraph three of the syllabus*; see also Cleveland v. Embassy Realty Invests., Inc.*, 8th Dist. Cuyahoga No. 105091, 2018-Ohio-4335, ¶ 20 (If the successful party obtains a satisfaction of the judgment, any appeal "'must be dismissed because the issues raised in the appeal have become moot.'"), quoting *Hagood v. Gail*, 105 Ohio App.3d 780, 785, 664 N.E.2d 1373 (11th Dist.1995).

{¶ 41} If a party adversely affected by a judgment fails to obtain a stay of the judgment, the successful party to the judgment has the right to attempt to obtain a satisfaction of the judgment even if an appeal of the judgment is pending. *See, e.g., Trumbull Twp. Bd. of Trustees v. Rickard,* 11th Dist. Ashtabula No. 2017-A-0048, 2019-Ohio-2502, ¶ 22, 27; *Wiest v. Wiegele*, 170 Ohio App.3d 700, 2006-Ohio-5348, 868 N.E.2d 1040, ¶ 12 (1st Dist.). Where a party is entitled to enforce a judgment, actions to enforce the judgment do not render subsequent payment involuntary. *CommuniCare Health Servs. v. Murvine*, 9th Dist. Summit No. 23557, 2007-Ohio-4651, ¶ 19. An appellant is deemed to have acted voluntarily in satisfying a judgment when the appellant fails to seek a stay of execution prior to the judgment being satisfied. *Hagood* at 790. As the Third District explained in *Crites v. Crites*, 3d Dist. Defiance No. 4-18-03, 2019-Ohio-1043:

Generally, a party may avoid a voluntary satisfaction of judgment by moving to stay execution of the judgment and by posting a supersedeas bond in an amount deemed by the trial court to be adequate to secure the judgment. *See* R.C. 2505.09; Civ.R. 62(B); App.R. 7(A), (B). "'Once the appellant obtains the stay of execution, neither the trial court nor the non-appealing party is able to enforce the judgment.'" *Alan v. Burns*, 9th Dist. Medina No. 3271-M, 2002-Ohio-7313, ¶ 5, quoting *LaFarciola v. Elbert*, 9th Dist. Lorain No. 98CA007134, 1999 Ohio App. LEXIS 5833, 2 (Dec. 8, 1999). "'The lone requirement of Civ.R. 62(B) is the giving of an adequate supersedeas bond.'" *Id.*, quoting *State ex rel. Ocasek v. Riley*, 54 Ohio St.2d 488, 490, 377 N.E.2d 792 (1978). Conversely, "[a] judgment is voluntarily satisfied 'where the party fails to seek a stay prior to the satisfaction of [the] judgment.'" *Summit Servicing Agency, L.L.C. v. Hunt*, 9th Dist. Summit No. 28699, 2018-Ohio-2494, ¶ 13, quoting *CommuniCare Health Servs., Inc. v. Murvine*, 9th Dist. Summit No. 23557, 2007-Ohio-4651, ¶ 20.

*Id.* at ¶ 11.

{¶ 42} This rule applies to garnishment proceedings:

Obtaining satisfaction through garnishment proceedings is considered a "voluntary" payment. *Francis David Corp. v. MAC Auto Mart, Inc.*, 8th Dist. Cuyahoga No. 93951, 2010-Ohio-1215, ¶ 12. In order to avoid execution on the judgment, a stay of execution must be obtained and a supersedeas bond or its equivalent must be posted. *Id.* In the event a judgment is satisfied through garnishment or attachment, any pending appeal is deemed moot and dismissal of the appeal is the appropriate remedy. *Id.*; *Cleveland v. Embassy Realty Invests., Inc.*, 8th Dist. Cuyahoga No. 105091, 2018-Ohio-4335, ¶ 23. * * * It is the appellant's responsibility to ensure the stay is obtained in order to preserve appellate review.

*Cleveland v. Spears*, 8th Dist. Cuyahoga No. 107841, 2019-Ohio-3041, ¶ 8-9.

{¶ 43} In other words, a judgment satisfied through garnishment proceedings is not considered an "involuntary payment" if the judgment creditor was entitled to enforce the judgment at that time and the judgment debtor could have availed itself of a "'viable legal remedy,'" i.e., posting a supersedeas bond to obtain a stay of execution, but failed to do so. *Reliable Credit Assn. v. SAFA, Inc.*,

12th Dist. Butler No. CA2018-11-223, 2019-Ohio-2492, ¶ 17-19 (appellant voluntarily satisfied judgment rendering appeal moot where judgment was satisfied through garnishment proceedings and appellant did not seek a stay of execution of the garnishment or otherwise object to the garnishment), quoting *Francis David*, 2010-Ohio-1215, at ¶ 12.

**O'Donnell's Execution on the Judgment**

{¶ 44} In this case, after the trial court entered its final judgment, O'Donnell immediately sought to execute on the judgment. On May 2, 2019, the clerk of courts issued a certificate of judgment in the amount of $1,253,738.50, plus 5 percent post-judgment interest from May 1, 2019 and $956.60 in costs in favor of O'Donnell (as the judgment creditor) and against NEON (as the judgment debtor). On May 6, 2019, O'Donnell filed and served an affidavit, order and notice of garnishment of property other than personal earnings ("garnishment notice") on PNC Bank, N.A. ("PNC Bank"), one of the banks at which NEON had funds on deposit.

{¶ 45} In response, NEON filed an "emergency motion" to stay execution pending appeal with the trial court. NEON asserted that it would suffer irreparable harm if its assets on deposit at PNC Bank were garnished in satisfaction of the judgment and requested that the stay "not be conditioned upon the posting of a supersedeas bond" because "[t]he bond requirement would place NEON's other creditors in undue jeopardy and force NEON to discontinue its charitable health care services operations." NEON further requested that the court "schedule an

immediate hearing to determine the amount of the supersedeas bond necessary, if any."

{¶ 46} The trial court entered an interim stay of execution pending a hearing on NEON's motion, which it scheduled for May 12, 2019. After the hearing, the trial court denied NEON's motion and lifted the interim stay, stating "defendant's emergency motion to stay execution of judgment pending appeal is denied, and governed by Civ.R. 62(B) and R.C. 2505.09."

{¶ 47} NEON then filed an emergency motion to stay execution pending appeal with this court, raising the same arguments it had raised below. On May 15, 2019, this court granted NEON's motion in part and stated that a stay of execution would be "effective upon the posting of a supersedeas bond in the amount of $1,253,738.50." NEON, however, never posted this supersedeas bond. Instead, NEON disputed O'Donnell's right to garnish its assets and filed a motion to vacate the PNC Bank garnishment notice with the trial court.

{¶ 48} PNC Bank filed an answer of garnishee, indicating that it had $1,168,423 of NEON's funds on account. The trial court denied NEON's motion to vacate the garnishment order and stated that, pursuant to this court's May 15, 2019 order and Civ.R. 62(B) and R.C. 2505.09, "this matter shall be stayed upon the posting of a supersedeas bond in the amount of $1,253,738.50."

{¶ 49} On June 11, 2019, the trial court held an evidentiary exemption hearing. The trial court determined that the funds in NEON's PNC Bank account were "properly attachable" and ordered that (1) PNC Bank deposit the funds with

the clerk of courts and (2) the clerk of courts thereafter disburse the funds (less poundage) to O'Donnell. On June 14, 2014, PNC Bank deposited $1,168,423[3] from NEON's PNC Bank accounts with the clerk of courts and the clerk of courts released $1,156,638.77 to O'Donnell.

{¶ 50} In an attempt to collect the balance of the judgment, in July 2019, O'Donnell filed two more garnishment notices — another garnishment notice directed to PNC Bank and one directed to KeyBank. KeyBank filed an answer of garnishee and deposited $97,099.73 with the clerk of courts. The trial court scheduled an exemption hearing for August 22, 2019.

{¶ 51} On August 1, 2019, NEON filed a "motion to modify bond requirement to existing judgment amount" with this court, requesting that this court reduce the amount of the supersedeas bond required for a stay of execution to $97,099.73. On August 7, 2019, this court granted the motion and ruled that a stay of execution would be effective upon NEON's posting of a supersedeas bond in the amount of $97,099.73.

---

[3] The answer of garnishee form submitted by PNC Bank directed the garnishee to identify the "amount over $450" "[i]n money, property, or credits, other than personal earnings, of the judgment debtor under the garnishee's control and in the garnishee's possession." PNC Bank identified that sum as $1,167,973 ($1,168,423 - $450). Accordingly, the trial court ordered PNC Bank to deposit $1,167,973 with the clerk of courts; however, PNC Bank made two deposits totaling $1,168,423 with the clerk of courts.

**The Stay**

{¶ 52} On August 12, 2019, NEON posted a supersedeas bond in the amount of $97,099.73. Following the posting of the bond, the trial court ruled that "any post-judgment execution proceedings have been stayed pending the appeal" and that "any funds on deposit with the clerk" would remain in escrow with the clerk of courts pending the appeal. The trial court explained:

> By holding the funds in escrow with the clerk pending the appeal, the court finds that it has properly given effect to the stay obtained by defendant in that this court has stopped the post-judgment proceedings at the exact status that existed at the time that defendant obtained the stay and thus prevented any potential disbursement of the finds to the plaintiff. The court does not find that the stay obtained can retroactively undue [sic] the depositing of the funds that occurred prior to the stay becoming effective. The court also does not find[] that the holding of funds in escrow in any way allows for further collection on the judgment via the bank attachment because the funds are not being dispersed to the plaintiff, but are rather remaining with the clerk as they otherwise would have been pending the garnishment hearing that defendant requested. In this way, the court does not find that it is further enforcing the bank attachment, but instead is preserving the status of the bank attachment proceedings that existed at the time of the stay in accordance with the obtainment of the stay. As previously ordered, the court hereby orders that any funds on deposition with the clerk remain in escrow with the clerk pending the appeal and until further order of the court.

{¶ 53} In this case, O'Donnell has not received full satisfaction of judgment, but only partial satisfaction of judgment. *Compare DeMeter v. Castle Bail Bonds, Inc.,* 10th Dist. Franklin No. 14AP-918, 2015-Ohio-2540, ¶ 7-8 (judgment was satisfied in full rendering appeal moot after trial court disbursed garnished funds to appellee); *Capital Communications v. GBS Corp.*, 10th Dist. Franklin No. 10AP-08, 2010-Ohio-5964, ¶ 9-15 (appeal moot when appellant failed to seek a stay to prevent

the distribution of escrowed funds that satisfied judgment). O'Donnell has not filed a notice of satisfaction of judgment. $97,099.73 remains in escrow with the common pleas court pending resolution of this appeal.

{¶ 54} *Spencer v. Kiowa Developing Co.*, 9th Dist. Summit Nos. 19524 and 19532, 2000 Ohio App. LEXIS 2 (Jan. 5, 2000), on which O'Donnell relies for his argument that the judgment in this case has been satisfied, is distinguishable. In that case, the bank deposited the garnished funds with the court before the appellant filed a motion to stay execution of the judgment, i.e., "satisfaction of the judgment occurred prior to the [appellant's] request for a stay of execution." *Id.* at 1-3. In this case, this court granted NEON's motion to stay execution upon the posting of an appropriate supersedeas bond in May 2016, before the KeyBank garnishment notice was issued. This court later reduced the amount of the supersedeas bond and the stay was effected — before the scheduled exemption hearing was held by the trial court and before the garnished funds were distributed to O'Donnell.

{¶ 55} "Once the appellant in an appeal has obtained a valid stay order from either the trial court or appellate court, the nonappealing party cannot initiate any proceeding to enforce the judgment in question. Nor can the trial court take any action in aid of execution." *Hagood*, 105 Ohio App.3d at 785, 664 N.E.2d 1373. Thus, the judgment in this case has not yet been fully satisfied. While voluntary, full satisfaction of a judgment will moot an appeal, we do not agree that partial satisfaction has the same effect. *See, e.g., Blood v. Nofzinger,* 162 Ohio App.3d 545, 2005-Ohio-3859, 834 N.E.2d 358, ¶ 20 (6th Dist.) ("a 'satisfaction of judgment' does

not mean a 'partial' or 'substantial' satisfaction of judgment"; matter was not moot where judgment was only partially satisfied); *see also Shumaker v. Hamilton Chevrolet, Inc.,* 184 Ohio App.3d 326, 2009-Ohio-5263, 920 N.E.2d 1023, ¶ 14-16 (4th Dist.) (where cross-appellant did not satisfy portion of trial court's judgment awarding cross-appellee attorney fees, his cross-appeal was not moot to the extent it challenged the trial court's decision to award those fees). Accordingly, O'Donnell's appeal is not moot.

{¶ 56} We now turn to the merits of NEON's appeal.

**NEON's Motion for Directed Verdict**

{¶ 57} In its first assignment of error, NEON argues that the trial court erred in denying its motion for directed verdict on O'Donnell's age discrimination claim under R.C. 4112.02(A), made at the close of O'Donnell's case-in-chief, because O'Donnell failed to present sufficient evidence establishing that NEON's stated reason for his termination was pretextual and that age discrimination was the real reason for his termination.

{¶ 58} Civ.R. 50(A)(4) provides:

When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

## Proving Age Discrimination in Employment

{¶ 59} O'Donnell asserted claims of intentional, disparate treatment age discrimination against NEON pursuant to R.C. 4112.02(A) and the ADEA. Under R.C. 4112.02(A), it is "an unlawful discriminatory practice" "[f]or any employer, because of the * * * age * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." The ADEA similarly provides that an employer may not "discharge any individual * * * because of such individual's age." 29 U.S.C. 623(a)(1).

{¶ 60} The same evidentiary framework applies to age discrimination claims under R.C. 4112.02(A) and the ADEA. *See, e.g., Green v. Schaeffer's Invest. Research, Inc.*, S.D.Ohio No. 1:09-cv-360-HJW, 2012 U.S. Dist. LEXIS 26136, 13 (Feb. 29, 2012), citing *Campbell v. PMI Food Equip. Group, Inc.*, 509 F.3d 776, 785 (6th Cir. 2007); *Blizzard v. Marion Technical College*, 698 F.3d 275, 283 (6th Cir. 2012) ("Age discrimination claims brought under the Ohio statute are analyzed under the same standards as federal claims brought under the [ADEA]."), quoting *Wharton v. Gorman-Rupp Co.*, 309 Fed.Appx. 990, 995 (6th Cir. 2009); *see also Frick v. Potash of Sask, Inc.*, 3d Dist. Allen No. 1-09-59, 2010-Ohio-4292, ¶ 16 ("In interpreting the Ohio anti-discrimination statutes, Ohio courts have consistently looked to federal cases interpreting federal civil rights and age discrimination

legislation in addition to Ohio case law."), citing *Mauzy v. Kelly Servs., Inc.*, 75 Ohio St.3d 578, 582, 664 N.E.2d 1272 (1996). [4]

{¶ 61} A plaintiff may prove intentional age discrimination in employment (1) by direct evidence that a termination or other adverse employment decision was motivated by age or (2) indirectly, by circumstantial evidence, using the burden-shifting method articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as adopted by Ohio Supreme Court in *Barker v. Scovill, Inc.*, 6 Ohio St.3d 146, 451 N.E.2d 807 (1983), and *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 421 N.E.2d 128 (1981), and modified in *Coryell v. Bank One Trust Co. N.A.*, 101 Ohio St.3d 175, 2004-Ohio-723, 803 N.E.2d 781.

{¶ 62} In this case, there is no dispute that there was no direct evidence of age discrimination. Accordingly, O'Donnell needed to prove of age discrimination using the "indirect method of proof." *Warden v. Ohio Dept. of Natural Resources*, 2014-Ohio-35, 7 N.E.3d 533, ¶ 29 (10th Dist.).

{¶ 63} To indirectly establish discriminatory intent, the plaintiff must first establish a prima facie case of age discrimination. *Warden* at ¶ 29, citing *Dautartas*

---

[4] Although O'Donnell brought age discrimination claims against NEON under both R.C. 4112.02(A) and the ADEA, in its appellate brief, NEON specifically challenges only the denial of its motion for directed verdict under R.C. 4112.02(A); it makes no mention of O'Donnell's claim under the ADEA. Accordingly, although different remedies are available under the two statutes, even if NEON were entitled to the relief it seeks with respect to O'Donnell's age discrimination claim under R.C. 4112.02(A), the trial court's judgment against NEON on O'Donnell's ADEA claim would still stand.

*v. Abbott Laboratories*, 10th Dist. Franklin No. 11AP-706, 2012-Ohio-1709, ¶ 26. In a termination case, the plaintiff employee must prove by a preponderance of the evidence that he or she: (1) was a member of the statutorily protected class, i.e., over 40, (2) was terminated from employment, (3) was qualified for the position and (4) was replaced by, or the discharge permitted the retention of, a person of substantially younger age. *Coryell* at ¶ 20.

{¶ 64} If the plaintiff establishes a prima facie case, there is a presumption of age discrimination. *Warden* at ¶ 30. The burden of production then shifts to the defendant-employer to come forward with evidence of a legitimate, nondiscriminatory reason for the adverse employment action. *Id.*; *see also Snyder v. Orange Bd. of Edn.,* 8th Dist. Cuyahoga No. 108077, 2019-Ohio-3774, ¶ 20 (applying burden-shifting formula in a gender discrimination case).

{¶ 65} If the defendant presents evidence of a legitimate, nondiscriminatory reason for its actions, then the employer has overcome the presumption of discrimination that was raised by the prima facie case. *Frick*, 2010-Ohio-4292, at ¶ 20. The plaintiff must then present evidence that the employer's proffered reason was not the true reason, but merely a pretext for unlawful discrimination. *Id.* at ¶ 21.

{¶ 66} To establish pretext, a plaintiff must prove that the proffered reason (1) has no basis in fact, (2) did not actually motivate the employer's challenged conduct or (3) was insufficient to warrant the challenged conduct. *Warden* at ¶ 31. A reason cannot be a "pretext" for age discrimination unless it is shown both that

the reason was false and that age discrimination was the "real reason." *Id.*; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). "The plaintiff always has the ultimate burden of persuading the trier of fact the defendant intentionally discriminated against him [or her]." *Warden* at ¶ 31; *see also Frick* at ¶ 21 ("The ultimate inquiry in an employment-based age discrimination case is whether an employer took adverse action 'because of' age; that age was the 'reason' the employer decided to act.").

{¶ 67} In this case, there appears to be no dispute that O'Donnell established a prima facie case of age discrimination — at the time of his termination O'Donnell was 60; he was qualified for the job; and he was replaced by a person of substantially younger age, i.e., Voss, age 35.[5] There likewise appears to be no dispute that NEON met its burden of production to overcome the presumption raised by the prima facie case, by presenting evidence of a legitimate, nondiscriminatory reason for O'Donnell's termination, i.e., that O'Donnell was terminated due to disrespect and insubordination. *See You v. Northeast Ohio Med. Univ.*, 10th Dist. Franklin No. 17AP-426, 2018-Ohio-4838, ¶ 56 ("insubordination is a legitimate, nondiscriminatory reason for termination"), citing *DeBolt v. Eastman Kodak Co.*, 146 Ohio App.3d 474, 766 N.E.2d 1040 (10th Dist.2001), and *Hood v. Diamond Prods., Inc.*, 74 Ohio St.3d 298, 302, 658 N.E.2d 738 (1996).

---

[5] Although, at one point, NEON asserts in its brief that "[a]t the close of plaintiff's case in chief, plaintiff had failed to meet his burden of proof in establishing a prima facie case for age discrimination," its arguments both in its motion for directed verdict below and on appeal were limited to the issue of pretext.

**{¶ 68}** Accordingly, what the jury was left to decide is this case was whether NEON's stated reason for terminating O'Donnell was the "real reason" he was terminated or simply a "pretext" for age discrimination.

**Failure to Preserve Arguments for Appeal**

**{¶ 69}** As we turn to the merits of NEON's appeal, we are constrained in our review of the trial court's judgment by the steps NEON took (and failed to take) below and the arguments it makes (and failed to make) on appeal. First, although NEON filed a motion for directed verdict at the close of O'Donnell's case-in-chief, it did not renew its motion at the close of all the evidence. When the trial court denies a defendant's motion for a directed verdict at the close of the plaintiff's case-in-chief, the defendant must renew the motion at the close of all the evidence in order to preserve it for appeal. *See Beard v. St. Vincent Charity Hosp.*, 2017-Ohio-7608, 97 N.E.3d 811, ¶ 19 (8th Dist.); *Chem. Bank of New York v. Neman*, 52 Ohio St.3d 204, 206, 556 N.E.2d 490 (1990) ("[A] motion for directed verdict which is denied at the close of the plaintiff's evidence must be renewed at the close of all evidence in order to preserve the error for appeal."); *Helmick v. Republic-Franklin Ins. Co.*, 39 Ohio St.3d 71, 72, 529 N.E.2d 464 (1988), paragraph one of the syllabus ("When a motion for directed verdict is made by a defendant at the conclusion of the plaintiff's case and is overruled, the defendant's right to rely on the denial of that original motion as error is not waived when the defendant proceeds to present his evidence and defense as long as the motion is renewed at the conclusion of all the evidence."); *see also Raze Internatl., Inc. v. Southeastern Equip. Co.*, 2016-Ohio-5700, 69 N.E.3d

1274, ¶ 21 (7th Dist.) ("A directed verdict motion raised after the presentation of the plaintiff's case in chief must be renewed at the conclusion of all the evidence to preserve the error for appeal.  * * * Failure to renew at the close of all the evidence waives any error in the earlier denial of that dispositive motion."); *Wolford v. Chekhriy*, 6th Dist. Lucas No. L-14-1103, 2015-Ohio-3085, ¶ 28 (defendant failed to preserve trial court's denial of his motion for directed verdict based on collateral estoppel for appeal where he failed to renew his motion at the close of all evidence). By failing to renew its motion for a directed verdict at the close of all the evidence, NEON "forfeited the right to raise as error on appeal the court's failure to direct a verdict in [its] favor." *Beard* at ¶ 20.  Therefore, NEON's directed verdict argument is not properly before this court.

{¶ 70} Even where a party fails to file a motion for directed verdict, it can still preserve a sufficiency challenge by filing a motion for judgment notwithstanding the verdict ("JNOV").  *See* Civ.R. 50(B)(1) ("Whether or not a motion to direct a verdict has been made or overruled a party may serve a motion to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion.").  NEON, however, did not file a motion for JNOV in this case.  It did not file a motion for a new trial.  And it has not raised a challenge based on the manifest weight of the evidence on appeal.  *See Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 6 ("[W]hen the evidence to be considered is in the court's record, a party need not have moved for directed verdict

or filed a motion for a new trial or a motion for judgment notwithstanding the verdict to obtain appellate review of the weight of the evidence.").

{¶ 71} Recognizing these deficiencies, at oral argument NEON asserted for the first time that the trial court committed plain error in denying its motion for directed verdict. It did not include a plain error argument in its briefs.

{¶ 72} In civil cases, review for plain error is to be conducted "with the utmost caution." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121, 679 N.E.2d 1099 (1997). Plain error is limited to those "extremely rare cases" in which "exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a materially adverse effect on the character of, and public confidence in, judicial proceedings." *Id.*; *see also Gue v. Girardi*, 8th Dist. Cuyahoga No. 106269, 2018-Ohio-3788, ¶ 39. The error must be clearly apparent on the face of the record and must also be prejudicial to the appellant. *See, e.g., Wells Fargo Bank, N.A. v. Lundeen*, 8th Dist. Cuyahoga No. 107184, 2020-Ohio-28, ¶ 12. Plain error exists only where the error "seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss* at 122-123. "The plain error doctrine should never be applied to reverse a civil judgment simply because a reviewing court disagrees with the result obtained in the trial court, or to allow litigation of issues which could easily have been raised and determined in the initial trial." *Id.* at 122.

{¶ 73} As a general matter, "'[a]n issue raised during oral argument for the first time and not assigned as error in an appellate brief is waived.'" *D.H. v. J.C.*, 8th Dist. Cuyahoga No. 108553, 2020-Ohio-112, ¶ 25, quoting *Andreyko v. Cincinnati*, 153 Ohio App.3d 108, 2003-Ohio-2759, 791 N.E.2d 1025, ¶ 20 (1st Dist.), citing *Watkins v. Ohio Dept. of Human Servs.*, 10th Dist. Franklin No. 00AP-224, 2000 Ohio App. LEXIS 5018, 16-17 (Oct. 31, 2000) ("In general, an issue raised during oral argument for the first time and not assigned as error in an appellate brief is untimely."); *see also Hensel v. Childress*, 1st Dist. Hamilton No. C-180100, 2019-Ohio-3934, ¶ 21.

{¶ 74} Even at oral argument, however, NEON simply asserted that the trial court's judgment constituted plain error. It did not explain how or why the circumstances of this case rise to the level of plain error and did not offer any authority in support of its assertion that the claimed error here "seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss* at syllabus. Accordingly, we overrule NEON's first assignment of error.

**Inconsistent Verdicts**

{¶ 75} In its second assignment of error, NEON contends that the trial court erred in entering judgment on the jury's verdicts because the jury's verdict forms, finding only NEON — and not Austin — liable on O'Donnell's state-law

discrimination claim, are "internally inconsistent."[6] NEON contends that because Austin testified he was the sole decisionmaker with respect to O'Donnell's termination, the jury's determination that Austin was not liable for unlawful age discrimination under R.C. 4112.02(A) "precluded a finding of joint/several liability as to NEON."

{¶ 76} Once again, however, NEON has not preserved this issue for appeal. NEON never objected to or raised any issue regarding inconsistent verdicts before the trial court. If NEON believed the verdicts were inconsistent, it should have objected before the jury was discharged — when the trial court could have done something about it. Because NEON failed to do so, it has forfeited all but plain error. *See, e.g., Roberts v. Mike's Trucking, Ltd.*, 2014-Ohio-766, 9 N.E.3d 483, ¶ 37 (12th Dist.) ("In general, '[i]nherent inconsistencies between different general verdicts rendered by a jury must be raised by a party before the jury is discharged. If not so raised, such arguments are thereafter waived.'"), quoting *Alliance Excavating, Inc. v. Triangle Real Estate Servs., Inc.*, 10th Dist. Franklin No. 08AP-535, 2009-Ohio-2761, ¶ 10. Further, although NEON makes an argument for plain error in its reply brief, it did not raise plain error in its initial brief. Generally, an appellate court will not address an argument raised for the first time in a reply brief. *See, e.g., Raudins*

---

[6] The appellant has a duty to ensure that the record relating to his or her assignments of error is complete. However, we note that the jury's verdict forms were not included in the record submitted to this court on appeal. Accordingly, the only information this court has regarding the jury's verdict forms is what was stated in open court (as reflected in the trial transcript) and the limited information contained in the trial court's journal entries.

*v. Hobbs*, 2018-Ohio-2309, 104 N.E.3d 1040, ¶ 54, fn. 10 (8th Dist.), citing *Bank of N.Y. Mellon Trust Co., N.A. v. Unger*, 8th Dist. Cuyahoga No. 101598, 2015-Ohio-769, ¶ 7, fn. 1 (appellate courts "cannot accept arguments raised for the first time in the reply brief on appeal"); *Hadden Co., L.P.A. v. Zweier*, 10th Franklin No. 15AP-210, 2016-Ohio-2733, ¶ 15.

{¶ 77} However, even if we were to consider the issue, we would not find plain error. Once again, NEON has not shown that the claimed error "seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss,* 79 Ohio St.3d 116, 121, 679 N.E.2d 1099, at syllabus.

{¶ 78} Further, we do not agree with NEON's assertion that *Fulst v. Thompson*, S.D.Ohio No. 2:09-cv-725, 2009 U.S. Dist. LEXIS 109085 (Nov. 20, 2009), stands for the proposition that "if the plaintiff can establish that his supervisor violated [R.C. Chapter] 4112, only then liability may attach jointly and severally to the employer." Rather, in *Fulst*, the court stated: "No separate liability standard exists for 'employer' and 'supervisor.' * * * In order for liability to attach to [the supervisor], [the plaintiff] must show liability on the part of her true employer ***. If [the plaintiff] can demonstrate that [the organizational employer] violated R.C. Chapter 4112, liability may attach jointly or severally to [the supervisor]." *Id.* at 13; s*ee also Grant v. Target Corp.*, S.D. Ohio No. 2:10-cv-823, 2011 U.S. Dist. LEXIS 94057, 5-6 (citing *Fulst* and stating "[u]nder Ohio Rev. Code §4112.02(A), the elements of a cause of action for employment discrimination

against a manager or supervisor are essentially the same as those against the corporate employer, except that they presuppose the corporate employer's liability and require proof that the manager or supervisor participated in the acts for which the corporate employer has been held liable").

{¶ 79} In addition, NEON, once again, ignores O'Donnell's federal age discrimination claim under the ADEA. Unlike R.C. 4112.02(A), the ADEA does not provide for individual liability. *See, e.g., Sabouri v. Ohio Dept. of Edn.*, 6th Cir. No. 96-4331, 1998 U.S. App. LEXIS 1638, 5 (Feb. 2, 1998), citing *Stults v. Conoco, Inc.*, 76 F.3d 651, 655 (5th Cir. 1996).

{¶ 80} Accordingly, we overrule NEON's second assignment of error.

**Back Pay and Front Pay Damages**

{¶ 81} In its third assignment of error, NEON argues that the trial court erred in instructing the jury on front pay and back pay damages because O'Donnell failed to present sufficient "admissible evidence or testimony" to support an award of such damages.

{¶ 82} Back pay damages compensate a wrongfully terminated plaintiff for wages and benefits lost because of discrimination. "The purpose of back pay is to make wrongfully terminated employees whole and to put them in the position they would have been in had their employment not been terminated." *Sicklesmith v. Hoist*, 169 Ohio App.3d 470, 2006-Ohio-6137, 863 N.E.2d 677, ¶ 85 (7th Dist.), citing *State ex rel. Stacy v. Batavia Local School Dist. Bd. of Edn.*, 105 Ohio St.3d 476, 2005-Ohio-2974, 829 N.E.2d 298, ¶ 26.

**{¶ 83}** "Front pay is an equitable remedy designed to financially compensate an employee where reinstatement of the employee would be impractical or inadequate." *Sicklesmith* at ¶ 84. Front pay damages are designed to provide temporary compensation to the plaintiff while he or she seeks comparable employment. *See, e.g., Worrell v. Multipress, Inc.*, 45 Ohio St.3d 241, 246-247, 543 N.E.2d 1277 (1989) ("Front pay damages should be awarded for an interim period in circumstances where the discharged employee has employable and productive years ahead.").

**{¶ 84}** A trial court is required to provide jury instructions that correctly and completely state the law and that are factually warranted based on the evidence presented in the case. *See, e.g., Roberts v. Falls Family Practice, Inc.,* 9th Dist. Summit No. 27973, 2016-Ohio-7589, ¶ 16. NEON maintains that the trial court should not have instructed the jury on back pay damages because O'Donnell's counsel acknowledged during O'Donnell's opening statement that O'Donnell "was somewhat handicapped in his ability to find full-time employment in the last two years" after he left NEON due to his diagnosis with cancer:

> Jim fortunately fought and fought very hard and we're very glad to say that is now in remission. But going to chemotherapy and radiation multiple times a week isn't conducive to getting back on the job full time. Even so, Jim maintained his part-time employment, continued to earn what he could to mitigate the losses he had suffered.

**{¶ 85}** In light of his counsel's remarks, NEON contends that O'Donnell was "fully compensated" through his part-time work "given [his] health limitations * * * unrelated to his termination" and that the jury improperly awarded O'Donnell back

pay for a time period during which O'Donnell's health would have prevented him from working full time.

{¶ 86} NEON contends that the trial court should not have instructed the jury on front pay damages because O'Donnell's testimony regarding his plans for future employment was "speculative" in light of his health and age and he failed to present "essential data necessary to calculate a reasonably certain front pay award," such as discount tables or life and work expectancy tables.

{¶ 87} NEON, however, did not object to the submission of jury instructions on these issues below. Nor did it challenge the jury's back pay or front pay damages awards below. As such, once again, NEON has forfeited all but plain error. *See, e.g., White v. Artistic Pools, Inc.,* 9th Dist. Summit No. 24041, 2009-Ohio-443, ¶ 7; *see also* Civ.R. 51(A) ("On appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection."). NEON, however, has not argued plain error with respect to this assignment of error. We need not, sua sponte, consider a claim of plain error that the appellant has not argued on appeal. *See K.L. v. D.M.,* 9th Dist. Medina No. 15CA0010-M, 2016-Ohio-338, ¶ 5 (noting that appellate court would not "engage in an analysis of plain error if an appellant fails to argue plain error on appeal").

{¶ 88} Even if were consider the issue, we would find no error — much less plain error — in the trial court's submission of the issues of back pay and front pay damages to the jury.

{¶ 89} No evidence of O'Donnell's cancer diagnosis and treatment was introduced at trial. O'Donnell's counsel's comments regarding O'Donnell's health issues during his opening statement were not evidence and the trial court instructed the jury accordingly. *See, e.g., Telecom Acquisition Corp. I v. Lucic Ents., Inc.,* 2016-Ohio-1466, 62 N.E.2d 1034, ¶ 32 (8th Dist.). Although NEON argues on appeal that the trial court unfairly "barred defendants from mentioning cancer or [O'Donnell's] recovery despite the impact on [O'Donnell's] actual employability," it was NEON that requested that such evidence be excluded. Prior to trial, NEON filed a motion in limine to preclude evidence regarding O'Donnell's post-termination cancer diagnosis at trial.

{¶ 90} Expert testimony or other technical or specialized knowledge is not required to calculate back pay or front pay damages. *See, e.g., Potocnik v. Sifco Indus.,* 103 Ohio App.3d 560, 576, 660 N.E.2d 510 (8th Dist.1995). O'Donnell testified that at the time he was terminated, his base salary was $161,022. He testified that in July 2017, he was hired by a community qualified healthcare center in Youngstown on a part-time basis (without benefits) earning $96,000-$100,000 annually. O'Donnell further testified that he expected the position to end in July 2019 and that he intended to work to age 70½ to get maximum social security benefits. NEON had a full and fair opportunity to cross-examine O'Donnell regarding any perceived deficiencies with his testimony and claimed damages. We believe that under the particular facts and circumstances here, O'Donnell's testimony was sufficient for the trial court to submit the issues of front pay and back

pay to the jury. *See, e.g., Sicklesmith*, 169 Ohio App.3d 470, 2006-Ohio-6137, 863 N.E.2d 677, at ¶ 86-89; *Cavins v. S&B Health Care, Inc.*, 2015-Ohio-4119, 39 N.E.3d 1287, ¶ 122, 128-129 (2d Dist.)

{¶ 91} Accordingly, we overrule NEON's third assignment of error.

**Cross-Examination Regarding Arthur Fayne**

{¶ 92} NEON's fourth assignment of error relates to a line of questioning by O'Donnell's counsel during his cross-examination of Austin. During cross-examination, O'Donnell's counsel asked Austin if he was aware that Fayne had been indicted in federal court for forgery:

> [O'DONNELL'S COUNSEL:] Would it surprise you if I told you Arthur Fayne is in court today?
>
> [Austin:] I have no knowledge of it.
>
> Q. Do you know he was indicted?
>
> THE COURT: I thought you were saying he was sitting here.
>
> [O'DONNELL'S COUNSEL]: No. Across the street.
>
> THE COURT: Fine. He hasn't been convicted of anything.
>
> [O'DONNELL'S COUNSEL]: He has not been convicted of anything.
>
> THE WITNESS: He has not.
>
> [O'DONNELL'S COUNSEL]: He's been accused.
>
> THE WITNESS: Innocent until proven guilty.
>
> [DEFENDANTS' COUNSEL]: Objection to the line of questioning.
>
> THE COURT: It's a paragraph he got to fill the name in. I don't know anything more than that.

Q. Is Arthur Fayne the person you are discussing with Jim O'Donnell in the e-mail we are going to hear about from your counsel tomorrow, Arthur Fayne was indicted for crimes of deceit. Isn't that correct?

A. I don't know the details.

Q. Well, forgery. Let's start with forgery. Is that a crime of deceit?

[DEFENDANTS' COUNSEL]: Objection, your Honor.

THE COURT: Sustained. Sustained.

{¶ 93} NEON contends that this line of questioning was "irrelevant" and "inflammatory" and constituted improper impeachment under Evid.R. 609. We find no error here. Once NEON's counsel raised an objection to the line of questioning, the trial court promptly sustained the objection. The jury was specifically instructed at the close of trial that evidence did not include "any statement of counsel made during the trial" or "answers from a witness * * * to which the trial court sustained an objection." A jury is presumed to follow the instructions given by the trial court. *See, e.g., Locigno v. Bagley, Inc.,* 2016-Ohio-5924, 71 N.E.3d 644, ¶ 45 (8th Dist.); *cf. Torres v. Concrete Designs, Inc.*, 2019-Ohio-1342, 134 N.E.3d 903, ¶ 17, fn. 5 (8th Dist.) (declining to address various remarks made by opposing counsel during cross-examination where remarks were objected to by appellants' counsel, the trial court sustained the objection and "it is presumed the jury followed the trial court's instruction to disregard such remarks").

{¶ 94} Although NEON complains that the trial court "did not instruct the jury at that time to disregard even the slightest inference" that NEON was "associate[d] * * * with a criminally indicted forger" and did not "admonish

plaintiff's counsel for raising [the] line of questioning," NEON's counsel did not request a curative instruction or any further relief from the trial court at that time. Accordingly, the trial court was not required to provide it. *See, e.g., Howard v. HCR ManorCare, Inc.*, 2018-Ohio-1053, 99 N.E.3d 429, ¶ 113 (2d Dist.) ("Courts are not required to give limiting instructions unless they are requested to do so. * * * '[F]ailure to request a curative instruction at the time error can be avoided or corrected precludes any claim of error on appeal where it appears that a curative instruction would have obviated the potential prejudice.'"), quoting *Taylor v. Davignon*, 8th Dist. Cuyahoga No. 79019, 2001 Ohio App. LEXIS 4070, 2 (Sept. 13, 2001). NEON's fourth assignment of error is overruled.

### Cross-Examination Regarding ODJFS Document

{¶ 95} In its fifth assignment of error, NEON contends that the trial court erred in allowing O'Donnell's counsel to use a document from the Ohio Department of Job and Family Services ("ODJFS") during its cross-examination of Austin. The document indicated that NEON had opposed O'Donnell's application for unemployment benefits, advising ODJFS that it had discharged O'Donnell for violating a company rule. The document thus contradicted Austin's claim that the reason he did not specify a basis for O'Donnell's termination on his termination form, i.e., why he had left the "violation" line blank, was to allow O'Donnell to obtain unemployment benefits. O'Donnell's counsel also cross-examined Austin regarding ODJFS' determination that O'Donnell had been terminated without just cause:

Q. I'm going to read this now for the record. The claimant was discharged by Northeast Ohio Neighborhood Health Services, Inc., on 1-9-17. The employer discharged the claimant for violating a rule. The employer failed to establish negligence or willful disregard of the rule on the part of the claimant. Ohio's legal standards that determines if a discharge is without just cause, is whether the claimant's acts, omissions, or course of conduct were such that an ordinary person would find that the discharge not justifiable. After review of the facts, the agency finds —

[DEFENDANTS' COUNSEL]: Objection, Your Honor.

Q. — that the claimant was discharged without just cause.

[DEFENDANTS' COUNSEL]: Objection.

THE COURT: Folks, you have to understand that this is a conclusion reached by this agency. It's not binding on you, so to speak, to believe it. We weren't at the hearing. We don't know what was presented, things like that. They can argue this but --

[O'DONNELL'S COUNSEL]: Fair enough, Your Honor.

[DEFENDANTS' COUNSEL]: Your Honor, I would object to any introduction of this document to the record. It's a different statute. It's an entirely different standard.

THE COURT: That's what I just said. I thought I told them that.

{¶ 96} NEON contends that O'Donnell should not have been permitted to refer to the ODJFS document during Austin's cross-examination because it contained inadmissible hearsay and was not properly authenticated. O'Donnell asserts that use of the document during cross-examination did not violate the evidence rules because the document was not offered to prove the truth of the matters asserted therein but was used only for impeachment purposes to "impugn the credibility of Austin's testimony." We review a trial court's evidentiary rulings for abuse of discretion. *See, e.g., Bank of Am. v. Rogers,* 8th Dist. Cuyahoga No.

107464, 2019-Ohio-1443, ¶ 24 ("A court's evidentiary decisions are reviewed for abuse of discretion, and 'absent a clear showing that the court abused its discretion in a manner that materially prejudices a party,' a reviewing court will not disturb an evidentiary ruling."), quoting *Pappas v. Ippolito*, 177 Ohio App.3d 625, 2008-Ohio-3976, 895 N.E.2d 610, ¶ 19 (8th Dist.); *see also* Civ.R. 61 ("No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.").

{¶ 97} Based on the record before us, we cannot say that the trial court abused its discretion in allowing O'Donnell's counsel to use the ODJFS document when cross-examining Austin. Further, even if the trial court had erred in allowing O'Donnell's counsel to read from a portion of the document during Austin's cross-examination, NEON has not shown that it was materially prejudiced thereby or that any error otherwise affected a substantial right.

{¶ 98} The issue to be decided by jury was whether NEON terminated O'Donnell because of age, not whether NEON terminated O'Donnell for just cause. The ODJFS document was not admitted into evidence, it was not referenced during closing argument and the court gave the jury an appropriate, contemporaneous

limiting instruction, which promptly cured any alleged prejudice resulting from the reference to the ODJFS document. A jury is presumed to follow the trial court's limiting instructions. *See, e.g., State v. Richardson*, 5th Dist. Stark No. 201700063, 2018-Ohio-947, ¶ 42 ("It is well-established that juries are presumed to follow and obey the limiting instructions given them by the trial court.").

{¶ 99} Accordingly, we overrule NEON's fifth assignment of error.

**Punitive Damages**

{¶ 100} In its sixth and final assignment of error, NEON argues that the trial court erred in (1) charging the jury on punitive damages and (2) entering judgment on the jury's punitive damages award because there was "no evidence presented of actual malice on the part of any NEON employee."

{¶ 101} Once again, NEON has forfeited all but plain error. NEON did not object to the trial court instructing the jury on punitive damages. When the jury's verdicts were returned, NEON did not challenge the jury's finding that O'Donnell was entitled to punitive damages or its punitive damages award. And NEON filed no post-trial motions on the issue of punitive damages. NEON did not assert plain error with respect to the punitive damages award in its appellate briefs. As such, we are not required to address the issue. Even if, however, we were to consider the issue, we would not find plain error.

{¶ 102} Actual malice is "'(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of

causing substantial harm.'" *Thomas v. Columbia Sussex Corp.*, 10th Dist. Franklin No. 10AP-93, 2011-Ohio-17, ¶ 44, quoting *Preston v. Murty*, 32 Ohio St.3d 334, 512 N.E.2d 1174 (1987), syllabus.

{¶ 103} Here, there was evidence from which reasonable minds could conclude, at the very least, that NEON consciously disregarded O'Donnell's rights and knew that its actions would cause substantial harm to O'Donnell. As detailed above, O'Donnell presented evidence that he was terminated "on the spot" after more than 20 years of service, in violation of NEON's discipline policy, with no prior disciplinary record and no explanation provided as to why he was being terminated. Although Austin claimed he did not did not identify a reason for O'Donnell's termination on his termination form so that O'Donnell could receive unemployment benefits, the company later contested O'Donnell's right to receive unemployment benefits. NEON's human resource director testified that even as of the day of trial, nearly two years later, he had no idea why O'Donnell had been terminated and could not state that O'Donnell had not been terminated because of his age.

{¶ 104} As with NEON's first, second and third assignments of error, we cannot say, based on the record before us, that this is an "exceptional circumstance" that warrants invoking the plain error doctrine. Even if we were to conclude that the trial court committed one or more of the errors claimed by NEON, none of these errors has been shown to "seriously affect the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss,* 79 Ohio St.3d 116, 121, 679 N.E.2d 1099,

at syllabus.  Rather, each of the errors claimed by NEON "could easily have been raised," determined and, if appropriate, remedied, "in the initial trial." *Id.* at 122.  As such, they do not rise to the level of plain error.

{¶ 105} NEON's sixth assignment of error is overruled.

{¶ 106} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

EILEEN A. GALLAGHER, JUDGE

SEAN C. GALLAGHER, P.J., and
PATRICIA A. BLACKMON, J., CONCUR